13272

STATE v. PRIDMORE

(161 S. E., 335.)

74

*Messrs. Mendel L. Smith, J. D. Lanford and Price &
Poag,* for appellant,

*Messrs. J. G. Leatherwood, Solicitor, and C. Granville
Wyche,* for respondent,

November 12, 1931.

The opinion of the Court was delivered by MR. JUSTICE
BONHAM.

The appellant was tried at the August, 1930, term of the Court of general sessions for Greenville County on an indictment which charged him with murder, for that he caused the death of Nick Sanders by shooting him with a pistol the 9th day of July, 1930. This trial resulted in a mistrial. At the October, 1930, term of the Court the solicitor entered a *nolle prosequi* as to that indictment and gave out another. The grand jury which found the first indictment was held to be an illegal one, was discharged, and another drawn by order of the resident judge of that circuit. This grand jury returned a true bill upon the new indictment given to them, and upon this indictment the defendant was tried at the May, 1931, term of the Court. He was convicted of manslaughter, and sentenced to three years' penal servitude. From this conviction and sentence he appeals to this Court upon exceptions which allege error in the trial in several particulars. In argument, counsel groups the exceptions under four heads. We will adopt that grouping in considering them.

First. Should the indictment have been quashed upon the ground that it was returned by an illegal grand jury, the said grand jury having been drawn from a box filled by the jury commissioners on October 8, 1930, under an order signed by the resident Circuit Judge, at chambers, in a county other than the trial county, solely upon an *ex parte* petition of the solicitor, which order discharged the grand jury for the year and ordered the jury box emptied and refilled.

In the case of *State v. Wells,* S. C., 161 S. E., 177 this identical question was under consideration, and by the opinion of this Court filed October 16, 1931, was decided adversely to the position for which the appellant here contends. It disposes of this question.

Second. Was it error for the Presiding Judge to present a juror to defendant as impartial after the juror had stated that he had formed an opinion from reading the sworn evidence at the former trial; the juror say-

ing, however, that he could render a verdict on the law and the evidence?

The juror, Gullick, was being examined on his voir dire. He did state that he had formed an opinion predicated upon reading the testimony taken at the former trial. But he also stated that he had not read all of that evidence; that he was not related to the deceased or the defendant; that he was not conscious of any prejudice against the defendant, nor bias for the state; and that he could and would render a fair and impartial verdict based upon the evidence adduced at this trial, and upon the law as given the jury by the Court.

It is conceded in argument that the question of deciding upon the impartiality of the juror lay in the sound discretion of the Court. He saw the juror, could judge of his capacity, his intelligence, his ability to comprehend the questions put to him, and whether he answered them truthfully. There is nothing in the record to show that there was an abuse of discretion here.

In the case of *State v. Bethune*, 86 S. C., 144, 67 S. E., 466, 468, a homicide case, a prospective juror was being examined on his voir dire; the Court quoted Section 2944, Code Civ. Proc., 1902 (now Section 577, Code Civ. Proc., 1922), as follows:

"The Court shall, on motion of either party in suit examine, on oath any person who is called as a juror therein, to know whether he is related to either party, or has any interest in the cause, or has expressed or formed any opinion, or is sensible of any bias or prejudice therein and the party objecting to the juror may introduce any other competent evidence in support of the objection. If it appears to the Court that the juror is not indifferent in the cause, he shall be placed aside as to the trial of that cause and another shall be called."

Continuing the Court said: "The Court having permitted the juror to be questioned as to his relationship to the parties, as to his interest in the cause, as to whether he had formed

or expressed any opinion, and as to whether he was sensible of any bias or prejudice therein, and being satisfied from the answer that the juror was not disqualified, there was no error in presenting the juror. 'The Presiding Judge must determine on the character of the questions proposed, and when the examination shall cease' "—citing *State v. Coleman,* 8 S. C., 239; *State v. Coleman,* 20 S. C., 441; *State v. Hayes,* 69 S. C., 297, 48 S. E., 251.

In *State v. Williamson,* 65 S. C., 243, 43 S. E., 671, 672, this is found: "The first six exceptions complain of error in not excluding as incompetent certain jurors who, when examined on their *voir dire,* said they had formed and expressed their opinion as to the guilt or innocence of the accused, and that it would require evidence on the part of the defendant to remove that impression from their minds. Section 2944, Code 1902 (Now 577 Code 1922), provides, the Court, on motion of either party to suit, shall examine any person called as a juror therein, to know whether he is related to either party, or has any interest in the cause, or has expressed or formed an opinion, or is sensible of any bias or prejudice therein; and further provides that the juror shall be placed aside "if it appears to the Court that the juror is not indifferent in the cause.' Numerous cases from *State v. Dodson,* 16 S. C., 459, to *State v. Robertson,* 54 S. C., 151, 31 S. E., 868, construing the statute, declare that it invests the Circuit Court with exclusive power to determine whether a juror, after examination on his *voir dire,* is indifferent in the cause."

The judgment of the Court was affirmed.

In *State v. Milam,* 65 S. C., 321, 43 S. E., 677, this occurs: "The Circuit Judge did not err in allowing J. H. Kennedy to be sworn as a juror to try this cause. This Court has several times upheld the statute of the state which gives to the discretion of the Circuit Judge the determination of the question whether a juror is indifferent to the cause; and in the case of *State v. Haines,* 36 S. C., at page 507, 15 S.

E., 555, 556, the following language is used: 'At this moment we cannot recall another instance of a statutory provision relating to the trial' of causes, such as that now under consideration, that has been passed upon so frequently by this Court, and that too, with such distinctness. We have held in every case that this matter is confided by the law to the decision of the Circuit Judge, whose decision therein, so long as it relates to a question of fact, will not be reviewed by the Courts.' "

The judgment of the Court was affirmed in this particular, although the juror had expressed an opinion, but had declared that he would, nevertheless, be governed by the law and the testimony. The case was reversed on another ground.

In the case of *State v. Graham* reported in 159 S. E., page 838, 841, this question of the attitude of jurors was considered. Two jurors were put upon their *voir dire*. One of them answered that he had formed an opinion of the guilt of the accused based upon what he had heard about the courthouse since he had come to Court, and around the streets; that it would take evidence to remove that impression from his mind. The Presiding Judge said: "My idea about that is this: Most everybody hears talk about cases. It is bound to make some sort of impression on their mind, but the test is whether a man feels he can discard what he has heard on the outside and try a case according to the evidence he hears in Court, discard what he hears on the outside and be governed entirely by what he hears in Court. I think he meets the test. It would never do to reject people because they read newspapers—that would never do, because they read newspapers. I don't think the law has meant anything of that sort. It means where a man gets an opinion and gets it so settled in his mind he feels that it might influence him. If he swears that it wouldn't influence him, I couldn't reject him under a statement of that sort." The juror was not related to deceased or defendant, had no bias

or prejudice. He swore that despite the opinion so formed, he could render an impartial verdict on the evidence he heard in Court.

The other juror testified that he was unrelated; was without bias or prejudice; had formed an opinion upon what he had read in the papers; that it would take evidence to remove that impression from his mind; but he swore that he could put this impression out of his mind and be governed entirely by the evidence in the case.

Deciding the appeal, the Court said: "In our opinion the Trial Judge committed no error in ruling that these jurors were competent to serve on the case."

This Court has reached a like conclusion in the case at bar.

Third. Did the Presiding Judge err in refusing to allow the defense to prove other specific instances of violence by the deceased in dealing with the same subject-matter that was being dealt with at the time of the homicide; said evidence being offered for the purpose of showing mental attitude and habit?

It is not contested that the rule is that evidence of other acts of violence on the part of the deceased are inadmissible, unless they are directed against the defendant, or, if directed against others, were so closely connected in point of time or occasion as reasonably to indicate the state of mind of the deceased at the time of the homicide, or to produce reasonable apprehension of great bodily harm.

This is the rule as laid down in the case of *State v. Hill*, 129 S. C., 166, 123 S. E., 817, and supported by a large number of cases therein cited.

In the present case counsel for defendant sought to prove by the witness Ballenger that on an occasion prior to the homicide the witness had an experience with the deceased in which deceased used abusive language to witness, in the presence of witness's wife, and was rude and insulting and unreasonable to witness while he was driving over a surface treated road.

It is interpolated here by way of explaining the circumstances surrounding the homicide that the deceased was overseer of a highway which was being surface treated; that the defendant was supervisor of the county. He (the supervisor) drove upon the road thus being treated, which led to the altercation which led to the death of the road overseer at the hands of the defendant.

The state objected to the question propounded the witness. In the argument which ensued, the Court asked defendant's counsel if they proposed to offer witnesses as to independent transactions in order to show mental attitude, or character for peace and order of the deceased. Counsel replied: "Not his reputation for peace and good order, but his mental attitude as a rule in dealing with this very subject." After further colloquy, the Court said: "Now, what I mean by it is this, that the general reputation of the deceased for turbulence and violence is in issue. And you can pursue that to the extent of eliciting from any witness you may have whether or not that is predicated on any specific obession of the deceased if he had it."

Counsel for the defendant then said to the witness:

"Mr. Bellenger, in compliance with the ruling of the Court I will put the question to you in this way, do you know the reputation of the deceased, Nick Sanders, for turbulence and violence in this county with reference to dealing with people who run in on the roads, and by any experience of your own do you know whether or not he appeared to have an obession which made him go into a fit of violent temper?

"State: We object to that.

"The Court: Answer that yes or no.

"Defense counsel: Do you know that?

"Witness: I think I would have to say more than yes or no.

"Court: Better ask him if he knows his reputation as to turbulence and violence and then qualify him as to the other.

"Defense Counsel: As a matter of fact, we don't claim that this man inflicted any violence on people, struck them; as explained to the Court a while ago they went off and took what was said, but violence would include abusive manner.

"Court: Turbulence might include abusive conduct.

"Defense counsel: Have you heard it discussed and could say you know his reputation for turbulence and violence along that line?

"Witness: I have been told—

"Court: Reputation is what people say, if that reputation comes to you from the mouths of other people, say it, yes or no.

"Witness: Well, I would say yes under those conditions.

"Defense counsel: Now, Mr. Ballenger, would you say it was good or bad?

"Witness: Bad.

"Defense counsel: Now, from your own experience with him, if you had any, could you say that his conduct showed that he had an obession of mind that threw him into a violent temper or rage when a thing like that occurred?

"State's attorney: We object to that.

"Court: He can answer that from the standpoint of the reputation of the deceased, whether or not any element of turbulence or violence in his make up and conduct proceeded out of any obession he had."

To practically the same effect was the testimony of the witness Brissie, for the defense.

The witness Abercrombie for the defense was allowed to go into the minute particulars of an altercation which he said he had with the deceased over his driving upon a road which the deceased was having surface treated.

When the witness for the defense De Pass was on the stand, this occurred:

"Defense counsel: Did you know Nick Sanders in that section during his lifetime?

"Witness: Yes, sir.

"Defense counsel: Did you know his general reputation for turbulence and violence with reference to people coming on the road he was overseeing, from what the people say would you know?

"Witness: Yes, sir.

"Defense counsel: Was it good or bad?

"Witness: I would say it is bad.

"Defense counsel: Now, Mr. De Pass, from what the people say and from what you have observed, did he or not have an obession against people coming in on the road he was supervising?

"State's counsel: We object to that.

"Court: Note the objection, go ahead; answer yes or no.

"Witness: Yes, sir."

J. T. Taylor, Lee Taylor, G. W. Green, J. P. Ashmore, witnesses for defense, were all permitted to answer the questions substantially in the same form.

Did you know his reputation in the community for turbulence and violence with reference to dealing with the public who ran on his road?

From what you observed with him yourself, and what you heard, did he have any mental obession with reference to dealing with people who did that?

To each of these questions they answered "Yes." If there was error hereabout, the defendant may not complain; it was all to his advantage. The Court, having rightly stated the rule governing the admissibility of evidence relating to special acts, so far relaxed the rule as to admit practically all the defense claimed the right to introduce. Not one of the occurrences or times to which witnesses testified was shown to be within months of the date of the homicide. How this testimony could throw light on the mental attitude of the defendant at the time of the homicide is impossible to understand. But defendant got the full benefit of it.

Fourth. Was it error for the Presiding Judge to to charge a request offered by the state which was entirely contradictory of a request which was submitted by the defense, which request was couched in the exact language of the Supreme Court of this state?

Defendant's request was as follows: "Words accompanied by hostile acts may, according to circumstances, not only reduce a killing from murder to manslaughter, but may establish the plea of self-defense."

This request was charged.

At the request of the counsel for the state the Court charged this: "I charge you that words alone, however opprobrious, do not justify one in taking the life of a fellow citizen. Words accompaniel by hostile acts are not alone sufficient to establish the plea of self-defense. Even if it appears that the deceased used opprobrious words accompanied by hostile acts, the defendant must go further and show that he was without fault in bringing on the difficulty; that it was necessary to take the life of the deceased in order to save himself from death or serious bodily harm, or that it was apparently necessary to do so, and that a man of ordinary reason, firmness and courage would have acted as the defendant did."

The allegation of error is that the charge given at the request of the state nullified and contradicted that given at the request of the defense.

We do not accede to the correctness of this statement.

In the sentence taken from the *Mason case*, 115 S. C., 217, 105 S. E., 286, the Court did not say that "words accompanied by hostile acts will reduce a killing from murder to manslaughter, and will establish the plea of self-defense." On the other hand, the Court said that opprobrious words accompanied by hostile acts may, according to circumstances, not only reduce a killing from murder to manslaughter, but may establish the plea of self-defense.

Certainly, if the hostile acts which accompany the opprobrious words show a present intention of making a deadly assault, they might establish the plea of self-defense. They might well cause it to appear to the person attacked that he was about to suffer death or serious bodily harm, and might entitle him to judge by the appearance of the accompanying circumstances.

In charging the sixth request of the defendant the Presiding Judge said: "The request as it reads is: 'While ordinarily opprobrious words do not justify a blow, yet the jury is charged that words, accompanied by hostile acts, may establish the plea of self-defense.' "

He had preceded this with the language: "I charge you by way of amplification of the request to charge, that words accompanied by hostile acts and accompanied by the other elements which go to constitute a plea of self-defense would justify the defendant in acting." He followed the giving of the charge with these words: "That is if all of the elements which go to constitute a successful plea of self-defense as I have defined it to you, obtain."

Then the Court charged the seventh request as follows: "Words accompanied by hostile acts may, according to circumstances, not only reduce a killing from murder to manslaughter, but may establish the plea of self-defense."

Then the Court added: "I charge you that even as I charged you with reference to the preceding request to charge; that is correct when taken in connection with what I have defined to you as the elements of self-defense and whether or not the evidence shows that these elements did obtain."

Then he charged the eighth request of defendant, which is in these words: "Whether words accompanied by hostile acts are sufficient to make out the plea of self-defense depends upon the circumstances surrounding the defendant, and the appearances as presented to him at the time. In other words, the jury must place itself in the position occupied by

the defendant at the time and say what a man of ordinary reason, courage and firmness would have done under the circumstances."

The Court said: "I charge you that and it is in line with what I told you in reference to the preceding requests to charge."

The Court properly interpreted the principle laid down in the *Mason case,* and as so interpreted and charged there is no contradiction between the request of the defendant and that given at the instance of the state's attorney and of which defendant complains. It is illogical to suppose that the jury was confused.

The defendant preferred twenty-six requests to charge, all of which were charged. At the conclusion of this charge, the Court asked, "Anything else, gentlemen?" Counsel for defendant said: "Your charge has been very complete, in full, and I would only like the Court to tell the jury on the question of the greater weight of the evidence," etc. This was done. To the further question by the Court, "Anything further?" Counsel answered, "Nothing further." If counsel conceived that there was a contradiction in the charge, they should have brought it to the attention of the Court.

It appears to the Court that the Circuit Judge correctly and painstakingly charged the law of the case, and gave to appellant liberal treatment upon every issue made. Appellant has no ground of complaint.

There is no error. The exceptions must be overruled, and the judgment of the lower Court affirmed.

And it is so ordered.

MR. CHIEF JUSTICE BLEASE and MESSRS. JUSTICES STABLER and CARTER concur.

MR. JUSTICE COTHRAN (concurring in result): For the reasons stated in my dissenting opinion in the case of *State v. Wells,* upon the jury question involved, I would dissent in this case, but, since a majority of the Court have overruled the point raised in the *Wells case,* I feel constrained

to concur in the result of this opinion. Upon the other questions discussed herein, I concur.