531 S.E.2d 907

The STATE, Respondent,

v.

Norman E. STARNES, Appellant.

No. 25119.

Supreme Court of South Carolina.

Heard Sept. 21, 1999.

Decided May 8, 2000.

314

Joseph L. Savitz, III, of South Carolina Office of Appellate Defense, of Columbia, for appellant.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Assistant Attorney General Derrick K. McFarland, Assistant Attorney General S. Creighton Waters, of Columbia; and Solicitor Donald V. Myers, of Lexington, for respondent.

BURNETT, Justice:

Appellant admitted he shot and killed Bill Welborn and Jarrod Champlin. He maintained the shootings were in self-defense. Appellant was convicted of two counts of murder and possession of a firearm during the commission of a violent crime. The jury found one statutory aggravating circum-

stance and recommended a sentence of death.[1] The trial judge sentenced appellant to death and a concurrent sentence of five years' imprisonment. We reverse.

## FACTS [2]

Jody Fogle testified appellant arrived unexpectedly at his home at 10:00 p.m. on January 8, 1996. According to Fogle, appellant told him he wanted help moving some things. During the drive to appellant's home, appellant told Fogle about two men who had put a gun to his head and threatened to kill him. Fogle stated appellant demonstrated by holding a .22 gun to his head. Fogle testified he took the gun from appellant, determined it was loaded, then placed it on the car seat. A .38 revolver was on the dash of the car.

Fogle testified Welborn and Champlin were at appellant's home. He denied meeting either Welborn or Champlin previously. Fogle described Welborn and Champlin as "wired" as if on drugs. Champlin asked appellant to return his gun. Appellant gave Champlin the .22, the same gun appellant had been handling in the car. Appellant went into his bedroom; Fogle could hear appellant fumbling around in the bedroom.

Fogle testified Champlin asked him if he had some "dope." Fogle responded negatively. Champlin "chambered a round" in the gun, worked the slide, came towards Fogle stating "[I'm] going to kill [your] lying a___," and pointed the gun at Fogle's chest. Fogle testified he could tell Champlin was serious; he admitted, at that time, he would have shot Champlin if he had been able. Welborn told Champlin to give him the .22 and Champlin complied. A couple of seconds later, appellant shot Welborn three times with the .38 revolver.

Appellant testified Fogle had previously met Welborn. He explained while at a New Year's Eve party ten days before the shooting, Welborn asked appellant if he knew where he could get some crystal "meth," an illegal drug. Appellant stated no one at the party had the drug. Later, Fogle arrived at the

---

**1.** "Two or more persons were murdered by the defendant by one act or pursuant to one scheme or course of conduct." S.C.Code Ann. § 16–3–20(C)(a)(9) (Supp.1998).

**2.** The evidence is recited in the light most favorable to appellant.

party. Appellant testified Fogle had crystal methamphetamine. Appellant introduced Fogle to Welborn. He was not certain if a drug transaction occurred, but Welborn inquired if there was an automatic teller machine at the bank next door.

Appellant testified two nights before the shootings Welborn put an unknown amount of money in his pocket. Later the same evening, he returned the money to Welborn; he was unsure if he returned all of the money.

Appellant testified on January 8, 1996, he was at the restaurant he owned when Welborn and Champlin arrived. Welborn remained outside in a car. Appellant went outside and asked Welborn why he did not come inside and Welborn stated appellant owed him $40. Appellant gave Welborn $40 from the restaurant cash register and Welborn came inside the restaurant. Appellant described Welborn as "real agitated," "wired," "just acting unusual," "just full of energy." Appellant described Champlin as "hyper."

Appellant, Welborn, and Champlin left the restaurant. Appellant testified Welborn asked if appellant was afraid to die and commented about the $40. The three men went to a bar. Appellant testified Welborn was "still acting real antsy," "pacing the pool table." He thought Welborn was "coming down off of a high." Appellant described Champlin as "antsy, kind of wired, same as [Welborn] was acting, but not as bad."

Appellant stated while he was in the bathroom at the bar, Welborn came up behind him, grabbed him around the throat, and hit him in the head with a metal object which he thought was either a gun or a cigarette lighter. Welborn asked again about the $40 and stated "[y]ou don't do your f'ing friends like that."

Appellant left the bar with Welborn and Champlin.[3] He testified Welborn and Champlin asked him to get them some drugs. Appellant left Welborn and Champlin at his home and went to Fogle's home. He testified he did not take Welborn and Champlin with him because Fogle had previously told him he did not want any customers at his home.

---

3. A waitress testified as appellant and Welborn left the bar, Welborn stated to her in front of appellant, "you need to call Lexington County because [I] am going to take [appellant] up on Platt Springs Road and blow his f'ing brains out."

Appellant picked up Fogle and drove him to his (appellant's) home in order for Fogle to provide Welborn and Champlin with drugs. Appellant testified when he and Fogle entered his house, Welborn was on the telephone. Welborn hung up, put his arm around appellant's neck, and asked if they were going to "score." Appellant heard some noise. Champlin was cursing and pointing a gun at Fogle. Appellant testified he thought Champlin was going to shoot Fogle. He stated he had no idea why Champlin pulled a gun on Fogle.

Appellant stated he was scared and ran into his bedroom to "get away." He realized there was no exit, obtained his pistol, placed it in his back pocket, and returned to the living room in order to leave through the front door. He was opening the front door when Welborn yelled "Whoa. Where the F are you going?" Appellant turned around; Welborn was pointing a gun at him. Appellant testified he thought Welborn was going to shoot him. When he heard a "click," appellant pulled his revolver and shot Welborn multiple times. Welborn did not fire any shots.

Appellant testified he immediately thereafter shot Champlin, although he agreed he was not paying attention to Champlin and Fogle while he was in the bedroom and while he was reacting to Welborn. He testified he shot Champlin because "I thought he was going to shoot me." He admitted Champlin never pointed a gun at him. Appellant testified he did not know Champlin had given his gun to Welborn and Champlin was no longer armed. Appellant concluded he shot Welborn and Champlin "[b]ecause I thought I was going to get shot."

## GUILT PHASE ISSUES

I. Did the trial judge err by refusing to instruct the jury that, in regard to self-defense, a defendant has a right to act on appearances and does not have to wait before acting?

II. Did the trial judge err by refusing to instruct the jury on defense of others?

III. Did the trial judge err by refusing to allow the defense to question an inmate concerning allegations the prosecution had attempted to procure false testimony?

IV. Did the trial judge err by refusing to allow the defense to impeach Dawn Brudos by establishing she had a romantic relationship with Welborn?

## I.

Appellant argues the trial judge erred by refusing to provide the jury with more specific instructions regarding self-defense. He contends the judge should have instructed the jury A) he had the right to act on appearances and B) he did not have to wait before shooting. We agree.

With regard to self-defense, the trial judge instructed the jury, in part, as follows:

Self-defense is a complete defense. If established you must find the defendant not guilty. Now, in this case there are three elements that you would consider that are required by law to establish self-defense. First, first (sic), the defendant must be without fault in bringing on the difficulty. Second, *he must have actually believed, actually believed (sic) that he was in imminent danger of losing his life or sustaining serious bodily injury* or he actually was in such imminent danger. Third, if his defense is based upon his belief of imminent danger, then the reasonable person of ordinary firmness and courage would have entertained the same belief. If a defendant actually was in imminent danger, then the circumstances must have been such as would warrant a person of ordinary firmness, prudence and courage to strike the fatal blow in order to save himself from serious bodily harm or losing his own life.[4]

(Emphasis added).[5]

## A.

In *State v. Fuller*, 297 S.C. 440, 377 S.E.2d 328 (1989), this Court held it error for the trial judge to exclusively charge the

---

**4.** The language is taken directly from *State v. Davis*, 282 S.C. 45, 317 S.E.2d 452 (1984).

**5.** Appellant submitted written proposed jury instructions. Request to Charge No. 3 states: "If a person's right to fire in self-defense arises, he is not required to wait until his opponent is on equal terms or until his opponent has fired or aimed his weapon." Request to Charge No. 8, in

*Davis* instruction on self-defense when the defendant requests additional charges and the evidence supports the requests. The Court instructed the trial court to fashion an appropriate self-defense charge based on the facts and circumstances of each case.

In *Fuller*, the defendant requested a charge that he had the right to act on appearances. Quoting *State v. Jackson*, 227 S.C. 271, 278–279, 87 S.E.2d 681, 684–685 (1955), the Court set forth an appropriate charge on right to act on appearances:

> A defendant must show that he believed he was in imminent danger, not that he was actually in such danger, because he had the right to act on appearances, and under the circumstances as they appeared to him, he believed he was in such danger and a reasonable prudent man of ordinary firmness and courage would have entertained the same belief.

*State v. Fuller, supra* 297 S.C. at 443–444, 377 S.E.2d at 331; *see also State v. Gandy*, 113 S.C. 147, 148, 101 S.E. 644 (1919) ("A man may act, however, from appearance, and if it turns out, if the appearances are such that a man of ordinary courage, firmness, and prudence would have been justified in coming to the conclusion that the necessity did then and there exist to strike to save himself from serious bodily harm or death that would be sufficient, although it turned out afterwards that there was no actual danger present, and that the necessity to strike did not exist.").

■ Appellant was not entitled to an appearance charge in regard to the Welborn shooting. According to appellant, he was in actual danger when Welborn pointed a gun at him, cursed him, and questioned him as to where he was going. Appellant's claim to self-defense did not arise from a perceived, but rather an actual threat. Since there was no evidence appellant was acting on appearances, he was not

---

part, states: "[The defendant] had the right to act on the appearance of things at the time, taken in light of all the evidence. One has the right to interpret the conduct of the other party in light of all of the circumstances at the time of the incident." During the charge conference, appellant stated, in addition to the standard *State v. Davis, supra,* self-defense instruction, he also requested the judge instruct the jury on "[a]ppearances and whatnot and so forth." The trial judge indicated the substance of appellant's proposed instructions were included in his charge.

entitled to an appearance charge. *See State v. Lewis*, 328 S.C. 273, 494 S.E.2d 115 (1997) (defendant not entitled to insanity charge where no evidence supported the charge).

The State contends appellant was not entitled to an appearance charge with respect to the Champlin shooting because he did not testify he thought he saw a gun in Champlin's hand at the time of the shooting. We disagree.

■ The right to act on appearances is not limited to the situation where the defendant testifies he mistakenly thought he saw a weapon in the victim's hand. While an appearance charge is appropriate when the defendant erroneously believes he sees the victim with a weapon,[6] it has been applied elsewhere. In *State v. Jackson, supra*, the defendant testified he shot the victim after being awakened in his home by an intruder and blinded by a flashlight. The defendant did not testify he saw what appeared to be a weapon in the victim's hand. In fact, the defendant testified he could not see anything. The Court held the defendant was entitled to a charge on self-defense, including language on appearances.[7]

■ Appellant was entitled to an appearance charge in regard to the Champlin shooting. Immediately prior to the shooting, appellant observed Champlin hold a gun to Fogle's head and threaten to shoot him, apparently because the intended drug deal, which appellant had arranged, had gone awry. Welborn then pointed a gun at appellant and threatened to kill him as he attempted to leave. Unaware Champlin had passed his weapon to Welborn when appellant was in the bedroom, appellant erroneously believed Champlin was armed and intended to kill him. The trial judge should have charged

---

**6.** *See State v. Nichols*, 325 S.C. 111, 481 S.E.2d 118 (1997) (where defendant testified he saw a shiny object in victim's hand and thought it was a gun, he was entitled to charge on appearances); *State v. Fuller, supra* (where defendant testified he saw two victims open the trunk of their vehicle and thought he saw a shiny object in one victim's hand, he was entitled to charge on appearances).

**7.** In older cases, the reference to "acting on appearances" was routinely included in that portion of the self-defense charge regarding belief of imminent danger. *See State v. Pridmore*, 163 S.C. 73, 161 S.E. 335 (1931); *State v. Boyd*, 155 S.C. 432, 152 S.E. 677 (1930); *State v. Strickland*, 147 S.C. 514, 145 S.E. 404 (1928).

the jury appellant had the right to act on appearances.[8] *State v. Gourdine*, 322 S.C. 396, 472 S.E.2d 241 (1996) (the law to be charged is determined from the evidence presented at trial). Refusal to give a requested instruction on appearances necessitates reversal. *State v. Nichols, supra; State v. Fuller, supra.*

### B.

In charging self-defense, the trial court must consider the facts and circumstances of the case in order to fashion an appropriate charge. *State v. Fuller, supra.* Once the right to fire in self-defense arises, a defendant is not required to wait until his adversary is on equal terms or until he has fired or aimed his weapon in order to act. *State v. Hendrix,* 270 S.C. 653, 244 S.E.2d 503 (1978). Similarly, "[the accused] doesn't have to wait until his assailant gets the drop on him, he has the right to act under the law of self-preservation and prevent his assailant (sic) getting the drop on him." *State v. Rash,* 182 S.C. 42, 50, 188 S.E. 435, 438 (1936).

The facts presented at trial entitled appellant to a self-defense charge in regard to both shootings. Appellant testified Welborn pointed a gun at him and he believed Champlin was armed. Appellant did not have to wait for Welborn or Champlin to fire or aim at him before acting in self-defense. Accordingly, appellant was entitled to a charge instructing the jury he did not have to wait before acting in self-defense. Refusal to charge this request was reversible error. *State v. Nichols, supra* (where defendant requested charge he did not have to wait before acting in self-defense and the trial court gave a common-law instruction on self-defense, refusal to give the requested charge was reversible error).

### II. .

Appellant argues the trial judge erred by refusing to instruct the jury on defense of others. We disagree.

Under the theory of defense of others, one is not guilty of taking the life of an assailant who assaults a friend,

---

8. Of course, the jury would also have to find a reasonable, prudent man of ordinary firmness and courage would have believed he was in imminent danger under the circumstances.

relative, or bystander if that friend, relative, or bystander would likewise have the right to take the life of the assailant in self-defense. *State v. Long*, 325 S.C. 59, 480 S.E.2d 62 (1997). "[I]n order for the trial court to give a defense of others charge, there must be some evidence adduced at trial that the defendant was indeed lawfully defending others." *Douglas v. State*, 332 S.C. 67, 73, 504 S.E.2d 307, 310 (1998); *see also* William S. McAninch & W. Gaston Fairey, *The Criminal Law of South Carolina* (3rd ed. 1996) ("There must, of course, be some evidence that the defendant was defending others at the time of his act in order for him to be entitled to the instruction.").

 Appellant was not entitled to a charge on defense of others. Appellant testified after Champlin threatened Fogle, he went into his bedroom "to get away." He realized there was no exit, obtained his revolver, then returned to the living room to leave through the front door. At this point, Welborn verbally threatened appellant and pointed a gun at him. Appellant specifically maintained he shot Welborn and Champlin because he thought they were going to shoot him. At no point did appellant suggest he shot either Welborn or Champlin to protect Fogle. Accordingly, he was not entitled to a charge on defense of others. *See State v. Alford*, 264 S.C. 26, 212 S.E.2d 252 (1975) (where defendant did not testify he was shooting for purpose other than to protect himself, he was not entitled to charge on defense of others).

### III.

Appellant argues the trial court erred by refusing to allow the defense to question an inmate concerning allegations the prosecution had attempted to procure false testimony. We disagree.

Appellant testified in his own defense. On cross-examination, appellant denied while awaiting trial he told four inmates he planned to murder Welborn and Champlin, pre-dug their graves, and wanted to hire someone to kill Gwen Ott.[9] Thereafter, appellant called Chris Kopel as a defense witness.

9. At the time of the shootings Ott was appellant's live-in girlfriend. Ott helped appellant bury Welborn and Champlin. She reported appellant's involvement in the shootings in May 1996.

Kopel testified for several months he was appellant's cellmate in the Lexington County Detention Center. He testified an assistant solicitor met with him and asked him if he had ever heard appellant threaten Ott's life. Kopel responded negatively. The solicitor objected.

During a proffer, Kopel stated the assistant solicitor asked him if he would be willing to testify that he had heard appellant threaten Ott. Kopel believed the assistant solicitor was asking him to lie. The trial judge sustained the objection, stating appellant could cross-examine the four inmates if the State called them in reply. In reply, four inmates testified appellant told them he had planned to kill Welborn and Champlin, had pre-dug their graves, and wanted to hire someone to murder Ott. No testimony concerning actions on behalf of the Solicitor's Office or Sheriff's Department was elicited from these witnesses.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Rule 401, SCRE.

Kopel's testimony was irrelevant to any issue at trial. His testimony neither established the prosecution actually presented perjured testimony at appellant's trial nor impeached the testimony of the four inmates who testified in reply as he did not state the prosecution had attempted to procure false testimony from them. Moreover, the allegation the assistant solicitor attempted to procure false testimony is not relevant to the issues in appellant's trial. The trial judge did not abuse his discretion in ruling Kopel's testimony inadmissible. *State v. Lewis*, 293 S.C. 107, 359 S.E.2d 66 (1987) (admission or rejection of proffered testimony is within the sound discretion of the trial judge; absent an abuse of discretion, the ruling will not be disturbed on appeal).[10]

## IV.

Appellant argues the trial court erred by refusing to allow the defense to impeach Dawn Brudos by establishing she had a romantic relationship with Welborn. We agree.

---

10. Allegations of improper conduct by the Solicitor's Office could be raised at a hearing on prosecutorial misconduct.

Brudos was the first witness offered at trial. She testified she had known Welborn since 1993 and worked for his skydiving business. She testified Welborn, Champlin, and Champlin's girlfriend had been living in her home since mid-December 1995. Brudos testified two nights before the shootings Welborn was upset appellant had not returned $40 to him.

On cross-examination, defense counsel asked if Brudos had a romantic relationship with Welborn at the time of his death. She answered affirmatively. The solicitor objected. Defense counsel argued the question was relevant to establish Brudos' bias. After an *in camera* hearing, the trial judge sustained the objection and instructed the jury to disregard the question and answer.

 The Sixth Amendment guarantees a criminal defendant the right to meaningful cross-examination of adverse witnesses. "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in *otherwise appropriate* cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose the jury to the facts from which jurors ... could appropriately draw inferences relating to reliability of the witness.'" *Delaware v. Van Arsdall,* 475 U.S. 673, 680, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674, 684 (1986) (emphasis added), *quoting Davis v. Alaska,* 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347, 355 (1974). A trial judge, however, may impose limits on defense counsel from inquiry into the potential bias of a prosecution witness to prevent harassment, prejudice, confusion of the issues, repetitive or marginally relative examination. *Id.*

Rule 608(c), SCRE, also permits a party to impeach a witness by establishing bias or prejudice either through examination or otherwise. "'On cross-examination, any fact may be elicited which tends to show interest, bias, or partiality' of the witness." *State v. Brewington,* 267 S.C. 97, 101, 226 S.E.2d 249, 250 (1976) *quoting* 98 C.J.S. *Witnesses* § 560a (1957). A witness' romantic relationship with a party is a source of potential bias of which the jury should be aware in order to fully evaluate the witness' testimony. *McIntyre v. State,* 934 P.2d 770 (Alaska App.1997); *Orkin Exterminating*

*Co., Inc. v. McIntosh,* 215 Ga.App. 587, 452 S.E.2d 159 (1994); *State v. Erby,* 56 N.C.App. 358, 289 S.E.2d 86 (1982).

■ Under both the Sixth Amendment and Rule 608(c), SCRE, appellant was entitled to inquire if Brudos had a romantic relationship with Welborn. Certainly, an intimate relationship between Brudos and Welborn could affect Brudos' credibility. The trial judge erred by prohibiting appellant from making this inquiry.[11]

## SENTENCING PHASE ISSUE

V. Did the trial judge err by refusing to instruct the jury appellant was ineligible for parole?

## V.

Appellant argues he was entitled to a charge on parole ineligibility after the solicitor placed his future dangerousness in issue. He contends the trial judge's refusal to instruct the jury that he was parole ineligible violated his due process rights.[12] We disagree.

■ When the State places the defendant's future dangerousness at issue and the only available alternative sentence to the death penalty is life imprisonment without parole, due process entitles the defendant to inform the jury he is parole ineligible. *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994); *State v. Williams,* 321 S.C. 327, 468 S.E.2d 626 (1996). Due process is violated when the State "raises[s] the specter of [the defendant's] future dangerousness generally, but then thwart[s] all efforts by [the defendant] to demonstrate that, contrary to the prosecutor's intimations, he never would be released on parole and thus, in his view, would not pose a future danger to society." *Sim-*

---

11. Although it is appropriate to perform a harmless error analysis when a party alleges he was denied the right to cross-examine a witness for bias, such an analysis is unnecessary here because appellant has been granted a new trial.

12. U.S. Const. amend. XIV, cl. 1. Appellant does not allege an Eighth Amendment violation.

*mons v. South Carolina, supra,* 512 U.S. at 165, 114 S.Ct. 2187 (plurality opinion).[13]

At the time *Simmons* was decided, South Carolina's capital sentencing scheme provided if the jury did not find a statutory aggravating circumstance, a death-eligible defendant was sentenced to life imprisonment and eligible for parole in twenty years. If the jury found a statutory aggravating circumstance and did not recommend death, the defendant was sentenced to life imprisonment and eligible for parole in thirty years. S.C.Code Ann. § 16–3–20(A) (Supp.1993). However, if the defendant had a prior conviction for certain violent crimes, he was ineligible for parole. S.C.Code Ann. § 24–21–640 (Supp. 1993).[14]

By Act No. 83, § 10, 1995 Acts 557, the General Assembly amended the sentencing options for capital murder. Effective January 1, 1996, § 16–3–20 (Supp.1998) provides, in relevant part, as follows:

(A) A person who is convicted of ... murder must be punished by death, by imprisonment for life, *or by a mandatory minimum term of imprisonment for thirty years.* If the State seeks the death penalty and a statutory aggravating circumstance is found beyond a reasonable doubt ..., and a recommendation is not made, the trial judge must impose a sentence of life imprisonment. For purposes of this section, "life imprisonment" means until death of the offender. No person sentenced to life imprisonment pursuant to this section is eligible for parole, community supervision, or any early release program, nor is the person eligible to receive any work credits, education credits, good conduct credits, or any other credits that would reduce the mandatory life imprisonment required by this section. No person sentenced to a mandatory minimum term of imprisonment for thirty years pursuant to this section is eligible for parole or any early release program, nor is the person eligible to receive any work credits, education credits, good conduct credits, or any other credits that would reduce the mandato-

---

**13.** For purposes of this discussion, we assume the solicitor placed appellant's future dangerousness in issue.

**14.** Simmons was parole ineligible pursuant to § 24–21–640.

ry minimum term of imprisonment for thirty years required by this section....

(B) When the State seeks the death penalty, upon conviction or adjudication of guilt of a defendant of murder, the court shall conduct a separate sentencing proceeding. In the proceeding, if a statutory aggravating circumstance is found, the defendant must be sentenced to either death or life imprisonment. *If no statutory aggravating circumstance is found, the defendant must be sentenced to either life imprisonment or a mandatory minimum term of imprisonment for thirty years....*

(Emphasis added).

Under the new sentencing scheme, if the jury does not find a statutory aggravating circumstance, a death-eligible defendant may be sentenced to either life imprisonment or a mandatory minimum thirty year sentence at the discretion of the trial judge. Under either sentence, the defendant is ineligible for parole or any form of credit which would reduce the length of the sentence. However, if sentenced to the mandatory minimum sentence, the defendant would be unconditionally released from prison at the completion of thirty years.

*Simmons* is inapplicable under the new sentencing scheme. By its own terms, *Simmons* requires the jury be informed the defendant is parole ineligible only if no other sentence than death, other than life without the possibility of parole, is legally available to the defendant. *Id.,* 512 U.S. at 178, 114 S.Ct. 2187 (O'Connor, J., concurring) ("[a]lthough the only alternative sentence to death *under state law* was life imprisonment without the possibility of parole ...".) (emphasis added).[15] This interpretation is supported by decisions from other jurisdictions. *Ramdass v. Angelone,* 187 F.3d 396 (4th Cir.1999) (*Simmons* is inapplicable if, at time of sentencing proceeding, defendant is parole eligible under state law; hence where judgment had yet to be entered for defendant's third murder conviction, defendant was parole eligible under "three strikes" law); *United States v. Flores,* 63 F.3d 1342 (5th

---

**15.** *Keel v. French,* 162 F.3d 263, 270 (4th Cir.1998) (recognizing "that Justice O'Connor's concurrence actually represents the holding in Simmons.").

Cir.1995), *cert. denied,* 519 U.S. 825, 117 S.Ct. 87, 136 L.Ed.2d 43 (1996) (because sentencing guidelines vest district court with discretion to adjust life sentence downward, life sentence without possibility of parole is not only legal sentence other than death which defendant might receive and, therefore *Simmons* is inapplicable); *Allridge v. Scott,* 41 F.3d 213 (5ᵗʰ Cir.1994), *cert. denied,* 514 U.S. 1108, 115 S.Ct. 1959, 131 L.Ed.2d 851 (1995) (*Simmons* applies where capital defendant is ineligible for parole as a matter of law; *Simmons* does not apply even if it is unlikely defendant would be paroled); *People v. Simpson,* 172 Ill.2d 117, 216 Ill.Dec. 671, 665 N.E.2d 1228, *cert. denied,* 519 U.S. 982, 117 S.Ct. 436, 136 L.Ed.2d 334 (1996) (*Simmons* inapplicable where capital defendant is statutorily eligible for a sentence less than natural life imprisonment); *State v. McLaughlin,* 341 N.C. 426, 462 S.E.2d 1 (1995), *cert. denied,* 516 U.S. 1133, 116 S.Ct. 956, 133 L.Ed.2d 879 (1996) (*Simmons* inapplicable where alternative to death is not life imprisonment without possibility of parole). Under the new statute, a sentence other than life without the possibility of parole is an available alternative to the death penalty.[16]

▮ Moreover, the rationale for *Simmons* simply does not exist when there is a potential mandatory minimum thirty year sentence. Contrary to a sentence of life imprisonment without the possibility of parole, a mandatory minimum thirty year sentence does not rebut the State's argument regarding the defendant's threat to society. For this same reason the Court has repeatedly declined to apply *Simmons* when the defendant is parole eligible. *State v. Hill,* 331 S.C. 94, 501 S.E.2d 122, *cert. denied,* 525 U.S. 1043, 119 S.Ct. 597, 142 L.Ed.2d 539 (1998); *State v. Byram,* 326 S.C. 107, 485 S.E.2d 360 (1997); *State v. Simpson,* 325 S.C. 37, 479 S.E.2d 57, *cert. denied,* 520 U.S. 1277, 117 S.Ct. 2460, 138 L.Ed.2d 217 (1997); *State v. McWee,* 322 S.C. 387, 472 S.E.2d 235 (1996), *cert. denied,* 519 U.S. 1061, 117 S.Ct. 695, 136 L.Ed.2d 618 (1997). Accordingly, because a mandatory minimum thirty year sen-

---

**16.** The dissent contends the cases cited herein are inapposite. As explained in *State v. Shafer,* 340 S.C. 291, 531 S.E.2d 524 (2000), each of the referenced cases fully support the conclusion due process did not require the trial judge to instruct the jury appellant was parole ineligible.

tence was a legally available sentence, appellant's due process was not violated when the trial judge refused to instruct the jury appellant was parole ineligible.[17]

Additionally, appellant argues because the jury had already convicted him of two murders, it was bound to find the statutory aggravating circumstance of "two or more persons murdered by the defendant by one act or pursuant to one scheme or course of conduct" and, therefore, the only available sentence alternative to death was life without the possibility of parole. We find it inappropriate to assume the jury will find a statutory aggravating circumstance. Appellant's jury could have concluded that while appellant murdered Welborn and Champlin, the two murders were not pursuant to one scheme or course of conduct beyond a reasonable doubt. Because the jury could have failed to find the existence of a statutory aggravating circumstance, a potential mandatory minimum thirty year sentence existed and appellant was not entitled to a charge on parole ineligibility. *United States v. Flores, supra* (district court did not violate the principles of *Simmons* by refusing to inform the jury the defendant would be sentenced to life imprisonment without possibility of parole because a lesser sentence, *dependent on the jury's findings,* was available).

**REVERSED.**

TOAL, MOORE, JJ., and Acting Justice WILLIAM T. HOWELL, concur.

FINNEY, C.J., dissenting in a separate opinion.

FINNEY, Chief Justice:

I respectfully dissent from the majority's opinion insofar as it holds appellant was not entitled to a jury charge that he was parole ineligible pursuant to *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). As I explained in my dissent in *State v. Shafer,* 340 S.C. 291, 531 S.E.2d 524 (2000) **all** capital defendants are now parole ineligi-

---

**17.** Further, we note the sentencing statute provides for a mandatory *minimum* thirty year sentence. Based on the language of the statute, it is arguable a defendant sentenced to more than thirty years is eligible for parole after service of thirty years.

ble under the 1996 amendments to S.C.Code Ann. § 16–3–20 (Supp.1999). Appellant thus meets the two prerequisites for a *Simmons* charge: (1) parole ineligibility and (2) argument regarding future dangerousness. All the state cases cited by the majority as supporting its decision not to apply *Simmons* are distinguishable because in each the defendant faced a potentially parolable sentencing option under state law. The decision in *United States v. Flores,* 63 F.3d 1342 (5th Cir.1995) is simply unhelpful since parole has been abolished in the federal system. For these reasons, and the reasons given in my *Shafer* dissent, I would reverse the denial of appellant's request for a *Simmons* charge.