MCDONALD, J.:
*542 **152 Steven Otts appeals his conviction for the murder of Hydrick Burno, arguing the circuit court erred in (1) denying his motion for a directed verdict; (2) failing to tailor a self-defense instruction to the evidence presented; (3) instructing the jury on the law of defense of others with no accompanying explanation of the necessary elements or the burden of proof; and (4) declining to provide the jury with specific and clarifying language regarding involuntary manslaughter. We reverse and remand for a new trial.
Facts and Procedural History
On January 27, 2011, Steven Otts, Saca Jawea Coleman, Lakeisha Stallworth, and Antonio Valentine were out for the evening in the town of Ridge Springs in Saluda County. The group took Valentine's Ford Explorer to Orchard Park Apartments (Orchard Park), where Otts lived with Hydrick Burno's (Victim's) aunt and uncle. Valentine drove, Stallworth sat in the front passenger seat, and Coleman and Otts sat in the back.
**153 When the group arrived at Orchard Park, Otts and Coleman (Otts's girlfriend), were arguing because Otts wanted Coleman to go home with him, but she wanted to continue partying with Stallworth and Valentine. Stallworth testified Otts was "kind of aggressive" with Coleman and was "pulling" on Coleman to get her out of the Explorer. According to Stallworth, Otts pulled Coleman's coat over her head, leaving her in only a bra because she was not wearing a shirt under her coat.[1]
Coleman testified that when the group arrived at Orchard Park, Otts wanted her to get out of the Explorer, but she was not ready to go because she had not "finished partying yet." She admitted the two argued but denied that Otts assaulted her in any way. Otts denied hitting Coleman but admitted the two argued. When Otts grabbed Coleman's arm to escort her from the vehicle, she refused to exit.
As Otts and Coleman continued to argue, several Orchard Park residents heard the commotion. Angela Creech, who walked outside to her apartment balcony to see what was happening, testified she could see Otts and Coleman "arguing and tussling inside the vehicle." Creech said she could hear "licks" inside the Explorer; Otts was pulling on Coleman in an effort to get her out of the vehicle, and the two were "tussling and fighting." Victim, the couple's mutual friend,[2] then intervened in an attempt to break up the scuffle.
Stallworth did not remember Victim striking Otts and explained he "wasn't that type of guy." However, Creech testified Victim put his hand around Otts once and held him in a "bear hug." Creech further testified Otts said to Victim, "Motherf****r, when you let me go, I'm going to knock your punk ass out." Coleman testified Victim "kept grabbing" Otts. She heard Otts tell Victim that if he did not let him go, he was going to hit Victim. However, Coleman did not see Otts strike Victim.
Otts testified that Victim grabbed him in a "bear hug" and carried him away from the Explorer. Otts admitted telling **154 Victim he was going to hit him if he did not let him go but denied threatening to "knock [his] punk ass out." When Otts escaped Victim's bear hug and attempted to walk back to the vehicle, Victim grabbed Otts again, ripping his coat. Otts then turned and struck Victim once on the left side of his head. Otts explained that he was "basically trying to get out of the situation" and "never meant to hurt [Victim]." When Otts threw the punch, Victim was knocked unconscious and fell to the ground, striking the back of his head on the pavement. Creech stated Victim had a seizure after falling to the ground. Stallworth testified she put her hands under Victim's head to try to stop him from seizing. Otts instructed Victim to "get up" and "stop playing." *543 When Creech announced she was going to call the police, Otts, Coleman, Stallworth, and Valentine left Orchard Park.[3]
Victim was awake and sitting on a curb when law enforcement and emergency medical services (EMS) arrived. He smelled of alcohol, was swaying, and was "a little confused." Initially, emergency medical technicians (EMTs) were unsure if the swaying and confusion were the result of Victim's head injury or intoxication.[4] However, during the transport to Lexington Regional Medical Center (LRMC), Victim's behavior changed-he became combative and uncooperative. He also showed more persistent signs of confusion, leading the EMTs to believe Victim had suffered a more serious head injury than they first recognized.
By the time Victim arrived at LRMC-about fifty minutes after EMS arrived at Orchard Park-he was unresponsive. Victim died shortly after his admission to the hospital.
According to the pathologist, Victim died from brain herniation due to cerebral edema, which was caused by blunt-force trauma to the left side of his head. The pathologist testified Victim's death was the result of the blow to the left side of his head and not the injury he suffered when he fell and hit the ground.[5] The pathologist further testified Victim suffered only **155 two blows to the head-one on the left side of his head from the punch and the other on the back of his head from hitting the ground.
Otts remained in hiding until January 31, 2011, when he turned himself in to police. On May 4, 2011, he was indicted for murder. After a four-day trial, the jury considered the murder charge, along with the lesser-included offenses of voluntary and involuntary manslaughter. The jury convicted Otts of murder.
Standard of Review
"A jury charge which is substantially correct and covers the law does not require reversal." State v. Adkins , 353 S.C. 312, 319, 577 S.E.2d 460, 464 (Ct. App. 2003). "To warrant reversal, a trial judge's charge must be both erroneous and prejudicial." State v. Taylor , 356 S.C. 227, 231, 589 S.E.2d 1, 3 (2003). "It is error to give instructions which may confuse or mislead the jury." State v. Rothell , 301 S.C. 168, 169-70, 391 S.E.2d 228, 229 (1990).
Law and Analysis
I. The "Defense of Others" Instruction
Otts argues the circuit court erred in instructing the jury with the "defense of others" language requested by the State because, when used appropriately, this jury instruction presents a possible defense to a criminal charge; it is not an instruction for the State to use offensively , nor was it an accurate instruction under the facts of this case. Otts further contends the instruction was incomplete and confusing to the jury in that it failed to set forth either the necessary elements of the "defense" or any framework for its application to the facts here. We agree.
During its opening statement, the State told the jury it would present evidence establishing that "Hydrick Burno went and tried to intercede on his cousin's behalf." The State further informed the jury it would hear about "the law of defense of others; about how, if there's a family member or a friend of yours[,] and they're being attacked, that you can stand in their shoes[,] and you can try to help them[,] and you can try to save them[,] and intercede." The State concluded its opening by stating, "Burno was trying to help his cousin, Saca Jawea Coleman, and was murdered for his troubles."
**156 On this point, the only evidence presented during the State's case-in-chief was one affirmative response from Stallworth:
Q: Was [Victim] trying to help [Coleman] as she was being assaulted by Mr. Otts?
*544 A: Yes, sir.
During Otts's case-in-chief, Officer Russell Padgett of the Saluda County Sheriff's Office testified that Stallworth informed him "Burno came out to assist [Coleman] and try to calm [Otts] down." On cross-examination, Officer Padgett characterized Victim's actions as "coming in defense of another person, a family member." Coleman, who also testified for the defense, admitted on cross-examination that although Victim was not her "cousin by blood," he was someone she was "very close to." Coleman admitted that Victim came out to try to help her during her argument with Otts. Likewise, when the State asked Otts if Victim "came out to help [Coleman]," Otts responded, "I'm assuming." The State followed up by asking Otts if Victim was acting in defense of Coleman. Otts answered, "[Victim] came out to calm us down."
In its closing argument, the State asserted "Burno was the only person man enough there to responsibly come out and defend [Coleman]." Thereafter, the State discussed the "defense of others" doctrine, which the State characterized as a person's "right to defend a friend or family member." The State explained that "a person coming to the defense of a friend or family member stands in their shoes and can exercise any rights that they have." The State further argued that "[t]he law in this case is if one comes to the assistance of his friend or relative and takes part in a difficulty in which a friend or relative is engaged, he enters the combat on the same footing as the person to whose assistance he comes and under the same legal status."
During the charge conference, the State requested a "defense of others" charge and noted its plan to use it in a reverse, offensive posture. Specifically, the State asked the court to instruct the jury that "[i]f one comes to the assistance of a friend or relative and takes part in a difficulty in which a friend or relative is engaged, he enters the combat on the same footing as the person whose [sic] assistance he comes **157 and under the same legal status." Otts objected, arguing that "defense of other[s] is a defense to a [criminal] charge," and noted that the State's effort to use the charge in an offensive posture would confuse the jury. Initially, the circuit court admitted the charge would be confusing to the jury because it was not being used as a defense, but offensively, by the State.
The State asserted the charge was necessary for two reasons: (1) informing the jury that Victim acted in defense of Coleman and "stood in her shoes" would negate the element of sufficient legal provocation required for voluntary manslaughter; and (2) the charge would "counter any self-defense issues." According to the State, this was a "Good Samaritan" case with an "unusual fact circumstance." The State argued that if Victim had killed Otts, Victim would "be entitled to complete and total immunity under the new stand-your-ground statute." The State further stated the defense of others component-that Victim stood in Coleman's shoes-was "vitally important when [Otts is] trying to raise self-defense."
Ultimately, the circuit court gave the following instruction:
Now under South Carolina law, if one comes to the assistance of a friend or relative and takes part in a difficulty in which a friend or relative is engaged, he enters the combat on the same footing as the person whose [sic] assistance he come [sic] and under the same legal status.
We are unable to find any South Carolina case law supporting the circuit court's charging the jury on the offensive "defense of others," at the request of the State, to address a victim's behavior. Indeed, our only case law addressing the defense of others is found in cases in which the instruction was presented as a possible defense to a charged offense. See e.g. , State v. Starnes , 340 S.C. 312, 323, 531 S.E.2d 907, 913 (2000) (holding the appellant was not entitled to a charge on defense of others because he specifically maintained that he shot the victims because he thought they were going to shoot him, not to protect a third party); Bozeman v. State , 307 S.C. 172, 177, 414 S.E.2d 144, 147 (1992) (finding evidence in the record supported a self-defense charge rather than a defense of others charge); State v. Alford, 264 S.C. 26, 35, 212 S.E.2d 252, 255 (1975) (holding that where defendant did not testify he was shooting for a purpose other than to protect himself, *545 he was not entitled to charge on defense of others), overruled on **158 other grounds by State v. Belcher , 385 S.C. 597, 685 S.E.2d 802 (2009) ; State v. Norris , 253 S.C. 31, 38, 168 S.E.2d 564, 567 (1969) ("The right of the father to defend his daughter is coextensive with the right of the daughter to defend herself.").
"The law to be charged is determined from the evidence presented at trial." State v. Gourdine, 322 S.C. 396, 398, 472 S.E.2d 241, 241 (1996). "[I]n order for the trial court to give a defense of others charge, there must be some evidence adduced at trial that the defendant was indeed lawfully defending others." Starnes , 340 S.C. at 323, 531 S.E.2d at 913 (quoting Douglas v. State , 332 S.C. 67, 73, 504 S.E.2d 307, 310 (1998) ). "Under the theory of defense of others, one is not guilty of taking the life of an assailant who assaults a friend, relative, or bystander if that friend, relative, or bystander would likewise have the right to take the life of the assailant in self-defense." Id. at 322-23, 531 S.E.2d at 913.
In State v. Wiggins , 330 S.C. 538, 545, 500 S.E.2d 489, 493 (1998), our supreme court explained that a person is justified in using deadly force in self-defense if:
(1) The person was without fault in bringing on the difficulty;
(2) The person actually believed he was in imminent danger of losing his life or sustaining serious bodily injury, or he actually was in such imminent danger;
(3) A reasonable, prudent person would have entertained the same belief;
(4) The circumstances were such as would warrant a person of ordinary prudence, firmness, and courage to strike the fatal blow in order to save himself from serious bodily harm; and
(5) The person had no other probable means of avoiding the danger of losing his own life or sustaining serious bodily injury than to act as he did in this particular instance.
Some of the State's own arguments alert us to the confusion created by the defense of others charge given here. For example, the State argued "there is no way a jury could decide this case without knowing what Mr. Burno's legal status was" and "the jury could not determine this case without knowing" this principle of law.
But the State's instruction as submitted and then charged to the jury failed to address the legal status of either Victim or **159 the person Victim was alleged to be defending-Coleman. The instruction provided no framework for the application of the self-defense elements necessary for proper evaluation of this "vitally important" legal principle, nor any guidance to the jury with respect to the applicable burden of proof.
Even if we were to accept that a defense of others instruction could be proper in an offensive posture-which, particularly under the facts of this case, we do not-the State would still be required to prove not only that Victim acted in defense of Coleman, thus satisfying the required elements of a self-defense claim, but also that Coleman's own actions satisfied them. And, necessarily, the State would bear the burden of proving such beyond a reasonable doubt.[6] Here, the jury had no guidance as to the application of this "offensive defense" because the charge failed to set forth either the necessary elements or the applicable burden of proof. Essentially, the jury was left with no standard by which to evaluate the actions and status of the defender or the person being defended.
Specifically, the instruction failed to extrapolate the elements of "self-defense" and instruct the jury to examine such factors as whether the defender and the defended were without fault in bringing on the difficulty, whether both actually believed Coleman was in imminent danger of death or great bodily injury, whether such belief was reasonable, and whether the defender and the defended had no other probable means of avoiding the danger than to act as they did in this particular instance. See Wiggins , 330 S.C. at 545, 500 S.E.2d at 493 (explaining the elements of *546 self-defense); State v. Bryant , 336 S.C. 340, 345, 520 S.E.2d 319, 322 (1999) ("Any act of the accused in violation of law and reasonably calculated to produce the occasion amounts to bringing on the difficulty and bars his right to assert self-defense as a justification or excuse for a homicide."); State v. Harvey , 110 S.C. 274, 277, 96 S.E. 399, 400 (1918) ("While a man may take life in defense of himself or another, yet the slayer, or the person in whose behalf the slayer strikes, must not only be without fault in provoking the difficulty, but there must be a necessity to **160 kill."). Thus, we find the offensive defense of others instruction requested here was incomplete, risked improper burden shifting, and was confusing for the jury. See State v. Day , 341 S.C. 410, 418, 535 S.E.2d 431, 435 (2000) (reversing murder conviction on multiple grounds, including the trial court's erroneous "after-the-fact" self-defense instruction; trial court's failure to charge on specific elements applicable to the defendant's theory constituted reversible error); Rothell , 301 S.C. at 169-70, 391 S.E.2d at 229 ("It is error to give instructions which may confuse or mislead the jury."). Therefore, we find the circuit court erred in instructing the jury on the defense of others.
II. Harmless Error
Having found the defense of others instruction erroneous, we must next consider whether the giving of the incomplete instruction was, nevertheless, harmless beyond a reasonable doubt. See Belcher , 385 S.C. at 611, 685 S.E.2d at 809 ("Errors, including erroneous jury instructions, are subject to harmless error analysis.").
"An appellate court generally will decline to set aside a conviction due to insubstantial errors not affecting the result." State v. Black , 400 S.C. 10, 27, 732 S.E.2d 880, 890 (2012). "When considering whether an error with respect to a jury instruction was harmless, we must 'determine beyond a reasonable doubt that the error complained of did not contribute to the verdict.' " State v. Middleton , 407 S.C. 312, 317, 755 S.E.2d 432, 435 (2014) (quoting State v. Kerr, 330 S.C. 132, 144-45, 498 S.E.2d 212, 218 (Ct. App. 1998) ). "In making a harmless error analysis, our inquiry is not what the verdict would have been had the jury been given the correct charge, but whether the erroneous charge contributed to the verdict rendered." Id. (quoting Kerr, 330 S.C. at 144-45, 498 S.E.2d at 218 ). "Thus, whether or not the error was harmless is a fact-intensive inquiry." Id. ; see also State v. Jefferies, 316 S.C. 13, 22, 446 S.E.2d 427, 432 (1994) ("We must review the facts the jury heard and weigh those facts against the erroneous jury charge to determine what effect, if any, it had on the verdict.").
At trial, the State maintained the defense of others instruction, along with its component that Victim stood in Coleman's **161 shoes, was "vitally important when they're trying to raise self-defense." Additionally, the State has repeatedly argued that the jury could not decide this case without the defense of others instruction. The State asserted "there's no way the jury could understand the elements of voluntary manslaughter if they couldn't understand what the Victim could legally do and not do." By its own argument, the State has established that the defense of others charge was critical to its case; thus, this court cannot find "beyond a reasonable doubt that the error complained of did not contribute to the verdict." See Middleton , 407 S.C. at 317, 755 S.E.2d at 435 (explaining that appellate courts must "determine beyond a reasonable doubt" that the error did not contribute to the jury's verdict).[7]
Conclusion
Based on the foregoing analysis, we reverse and remand for a new trial.
REVERSED AND REMANDED.
LOCKEMY, C.J., concurs.
WILLIAMS, J., concurs in result only.

Coleman contradicted Stallworth's testimony by explaining that she was wearing a shirt, not a jacket, and that Otts did not pull off her clothing.

Victim's mother and Coleman's uncle are married.

Coleman, Stallworth, and Valentine returned to the scene later that night.

When Victim was admitted to the hospital, his blood alcohol level was 0.274. At the time of autopsy, his blood alcohol level was 0.15.

Otts stipulated to Victim's cause of death.

Curiously, the State has repeatedly argued that neither State nor the defendant bore the burden of proof, asserting "I don't think anyone has the burden of proof on that issue. It's just a correct principle of law."

Because our reversal on the defense of others instruction is dispositive, we decline to consider Otts's additional assignments of error. See Futch v. McAllister Towing of Georgetown, Inc. , 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (stating an appellate court need not address remaining issues when resolution of a prior issue is dispositive).