14382

STATE v. RASH

(188 S. E., 435)

Messrs. *L. G. Southard, P. D. Barron, John C. Lanham* and *F. J. Bostick,* for appellant,

Messrs. *S. R. Watt, Solicitor,* and *Nichols, Wyche & Russell,* for the State.

November 17, 1936.

The opinion of the Court was delivered by Mr. Justice Baker.

The appellant, C. M. Rash, was tried at the October term of the Court of General Sessions at Spartanburg, S. C., on an indictment wherein he was charged with the murder of one Benson B. Page. Upon such trial he was convicted of manslaughter and sentenced to serve for a period of six years in the State penitentiary. He appeals to this Court, alleging error in the rulings and charge of the trial Judge.

Before referring to the exceptions, and for a better understanding of the questions made by this appeal, we, as briefly as possible, set forth the facts as to the homicide.

The appellant, a man of fifty-five years of age, was at the time of the fatal occurrence a policeman in the City of Spartanburg, which position he had held for twenty-three years. On the morning of August 6, 1935, the desk sergeant at the headquarters of the police department in Spartanburg received two calls for the police, one being made by a child from 816 North Church Street, which was the home of one W. R. McGraw, Jr., and the other being a call to go to Dewey Avenue, and these calls were given by the desk sergeant to the appellant Rash and another policeman, a Mr. Gosnell, to answer. These officers, in response to these calls, first went by automobile to 816 North Church Street. They, at first, missed the place, driving some little distance beyond said number, but promptly returned. This fact is mentioned in view of the innuendoes, intimations, and insinuations during the trial of the case that appellant was on intimate terms with Mrs. McGraw, and which will be referred to later herein.

Upon returning to 816 North Church Street, they were met by Mr. McGraw, who requested appellant to go inside his home, where he showed him where his piano had been greatly damaged and the piano stool broken to pieces. McGraw then informed appellant that B. B. Page had been to his home that morning considerably under the influence of whisky, "crazy drunk"; that Page had at first tried to get him (McGraw) to drink with him, and when he refused, he had demanded of him that he pay him $10.00 that was due him by the said McGraw. In explanation of this indebtedness, it developed that Page had loaned McGraw, at the time McGraw purchased the piano, $40.00 with which to complete the payment for same, and the $10.00 was the remaining balance due on this loan. When McGraw informed Page that he did not have the money, then and there but would get it and pay him, it enraged Page, who went into

the living room of the McGraw home and broke up the piano and demolished the piano stool. Thereafter, Page chased McGraw, having in his hand an open knife, and when he was unable to get to him, finally left the McGraw home, saying before leaving: "I can't catch you to cut you to pieces, but am going to brother Tom's and get a gun. I will see you in a few minutes. You tell that damn Rash the sun won't set on him and I will get you." There were other references made by Page with reference to appellant in which he applied vile epithets to him, accompanied by the threat that he was going to kill him. The references to Rash, the appellant, were made after McGraw told Page that "the law" will be here in a few minutes to get him. McGraw did not want Page arrested or prosecuted for what he had done, because they were good friends and worked for the same company, but requested appellant to go to the home of Page and warn him not to come back to his house, "that if he did, there would be blood-shed and a hell of a lot of it." Appellant and Page, the deceased, had been friends of long standing, and according to the testimony of appellant, he did not regard seriously the threat concerning himself, there being no reason why Page should have any enmity against him. Appellant testified that in response to the request made by McGraw, and for the purpose of quieting Page down and keeping him out of trouble, he, in company with Policeman Gosnell, went as a friend and as an officer to the home of Page with a view of preventing further trouble. When appellant reached the home of Page the automobile in which he and Gosnell were riding was parked on the opposite side of the street, and appellant got out, leaving Gosnell in the automobile, and walked across to the Page home, where he was met at the door by the young daughter of Page, who informed him that her father was at the next house. The record shows that between the time that Page returned to his home from the McGraw home and the arrival of appellant at the Page home, Page had slapped his wife, causing

her to fall or partially fall, and when two men who were walking on the sidewalk stopped and were looking at the altercation between Mr. and Mrs. Page, Page cursed them, chased them, and overtook one of them sufficiently to cut him in the back with his pocketknife.

What had occurred at the Page home and in front thereof following Page's leaving the McGraw home was unknown to appellant at the time he encountered Page.

The facts, as hereinabove set forth, can be said to be undisputed, except for some negative testimony to the effect that Page was not drinking on that morning, and the insinuations and intimations that appellant had not gone to the house of Page as a friend and officer, but for some other purpose on account of his relations with Mrs. McGraw. It is proper that we should, at this point, state that a careful reading of the entire record shows conclusively, not only that there was no basis for the insinuations regarding the relations of appellant and Mrs. McGraw, but that neither knew the other until the morning of this tragedy.

As to what occurred from the point where we left off above, that appellant was informed by the daughter of Page that he was at the next house, there is considerable controversy as to what took place until the ambulance left with the mortally wounded Page as the occupant therein.

Appellant states that as he returned to the sidewalk from the front door of the Page home, he met Mrs. Page, who had her head down and was crying. Mrs. Page denied she was crying. As appellant inquired of Mrs. Page as to what was the trouble, he heard Page at the next door say: "God damn them all." There was also testimony at this point that Page had said, "God damn the law," and other testimony that he did not curse at all. Page proceeded to walk out towards where appellant and Mrs. Page were standing, with his hand in his pocket, and it is uncontradicted that at some point before reaching them he took his knife out in his hand with the blade open. Appellant claims that Page commenced

to curse him and make threats towards him and was staggering from the influence of whisky, and that he thereupon told Page he was under arrest and not to come to him with that knife. Appellant's testimony along this line was corroborated by some witnesses and denied by others. It is undisputed that before reaching appellant, the wife and daughter grabbed hold of Page, and according to some of the testimony, succeeded in wresting the open knife from his hand and throwing it away, while appellant and other witnesses claim that he yet had his knife in his hand when he succeeded in breaking loose from his wife and daughter and was advancing on appellant. It seems to be undisputed that at the moment appellant fired what proved to be the fatal shot, and he shot only once, he had backed off of the sidewalk from the approach of Page, and that Page was advancing on him. There is also testimony that Mrs. Page and her daughter were screaming and hollering, and that in the screaming and hollering they were begging appellant not to shoot Mr. Page; that he had been disarmed of his knife. That there was great excitement and commotion from the time Mrs. Page and her daughter grabbed hold of Mr. Page until the fatal shot, there can be no question, and that it all occurred within a short space of time.

The record shows that when Page was under the influence of liquor he was a dangerous man, especially with reference to cutting people with his knife, and that this reputation was known to appellant.

Exceptions 1 and 2 allege prejudicial error in refusing to allow the witness McGraw to testify that he had informed appellant that Page was "crazy drunk"; that he wished the said appellant to go to the home of said Page and warn him not to come back to his home; that on account of the friendship existing between them, he did not wish Page arrested; and that it was therefore competent and relative to show the attitude of the defendant-appellant when he stated to McGraw that all he could do was make out a case of dis-

orderly conduct. The testimony excluded was largely the same as the appellant was allowed to testify to, and in the affidavit of appellant, which was introduced in evidence.

We are inclined to the opinion, especially where the defendant was being tried on the charge of murder, that this testimony should have been admitted for the purpose of showing the temper and condition of the deceased just a few minutes prior to the fatal encounter; and also for showing the general attitude and frame of mind of the appellant. It is, of course, difficult to always determine what testimony should be admitted or excluded, and therefore the admission or exclusion of testimony has to be left largely to the discretion of the trial Judge, and his discretion will not be disturbed unless it is manifest that there has been an abuse of his discretion to the prejudice of the accused. See case of *State v. Peak,* 134 S. C., 329, 339-340, 133 S. E., 31, and cases therein cited. In view of the fact that the defendant-appellant was allowed to cover this field of evidence in his testimony we cannot say that the refusal to allow the witness McGraw to also testify thereto amounted to such prejudicial error and abuse of discretion as would warrant this Court in granting a new trial on account thereof.

These exceptions are overruled.

The appellant has abandoned Exceptions 3, 4, 5, 7, 8 and 9.

Appellant's Exception 6, as amended, is as follows: "His Honor erred in failing and refusing to charge the Request to Charge submitted by the Defendant, the same being as follows, to-wit: 'The Defendant, C. M. Rash, has entered in this case the plea of self-defense; and in the consideration of th's defense, you should try as near as you can to put yourself in his situation at the time he fired the fatal shot. You should consider the circumstances by which he was surrounded, and take into consideration the person with whom he was dealing, and all of the facts which surrounded him, as you obtained the same from the testimony, and as near as you can, view the situation from his standpoint; and if

you reach the conclusion that a person of ordinary reason, coolness and prudence would have acted as he did under the circumstances that surrounded him at the time the fatal shot was fired, and if you find from the evidence that he has made out the other elements of self-defense, then your verdict in such a case should be "Not Guilty." ' It being respectfully submitted that the refusal of his Honor to charge this Request was prejudicial error in that the .said Defendant was entitled to have the jury instructed that, in considering the plea of self-defense, the jury should view the situation from the standpoint of the Defendant as shown by the testimony at the time he fired the fatal shot, and the said Request to so charge was pertinent and applicable to the defense of the defendant in this case."

This request to charge embodied a sound proposition of law and should have been charged in connection with the element of self-defense, that when the accused inflicted the fatal blow he believed himself in danger of death or serious bodily harm, and that a person of ordinary coolness and courage would have had reason to have believed that he was in danger of death or serious bodily harm, and would have acted, or should have acted, in that circumstance. Of course, if it appeared from a reading of the charge, as a whole, that the trial Judge so charged this law in connection with this element necessary to make out the plea of self-defense, appellant could not complain that the specific request to charge was not charged; since, as stated by Mr. Chief Justice Stabler, in *State v. Jones* (S. C.), 188 S. E., 178 (not yet reported [in State Reports]) : "It is elementary that the charge must be considered as a whole in determining whether error was committed."

The nearest approach to charging the law as requested in appellant's first request to charge, and to which the sixth exception is directed, was his charge as to the duty of one who is assaulted, to retreat, if by so doing he will not increase his danger, and while charging the law with ref-

erence to retreating, the trial Judge instructed the jury that an accused has the right to act upon appearances if he also acted as a person of ordinary coolness and courage would have acted in the circumstance. While the trial Judge was charging the law with reference to the duty of an individual attacked to retreat, he stated this: "And as I stated to you, one may act on appearances. He may be mistaken. The law does not hold him to a *refined assessment* of the danger, provided, of course, he acted as the person of ordinary coolness and courage would have acted or should have acted in meeting the appearance of danger. He doesn't have to wait until his assailant gets the drop on him, he has a right to act under the law of self-preservation and prevent his assailant getting the drop on him; if it is apparent, or reasonably apparent his assailant is taking steps to get the drop on him, he must take steps first to prevent such assailant from getting the drop on him." However, it will be seen that he was charging with regard to the duty of one attacked to retreat, and this part of his charge in no wise referred to the element of self-defense that when one inflicts a fatal blow he must believe himself in danger of death or serious bodily harm.

The writer hereof is of the opinion that the requested instruction was especially pertinent and applicable to the defense, in view of the facts of this case where there was so much confusion and excitement, where at one moment it was admitted that the deceased had an open knife in his hand advancing towards appellant, and in the next few seconds there is a dispute in the testimony if he still had the knife or if it had been taken from him by his wife and daughter before he jerked loose from them and started towards appellant again. However, a majority of the Court is of the opinion that this request was substantially covered in the general charge, and therefore this exception is overruled.

Exception 10 has been considered and is overruled.

Appellant's eleventh exception alleges error on the part of the trial Judge in refusing to charge appellant's additional or thirteenth request to charge. This request to charge contained good and bad law, and the exception being the failure of the trial Judge to charge it as a whole, it cannot be sustained.

Affirmed.

MR. CHIEF JUSTICE STABLER and MESSRS. JUSTICES BONHAM and FISHBURNE and MR. ACTING ASSOCIATE JUSTICE A. L. GASTON concur.