651 S.E.2d 321

**The STATE, Respondent,**

v.

**Grover RYE, Appellant.**

No. 26379.

Supreme Court of South Carolina.

Heard May 3, 2007.

Decided Sept. 10, 2007.

Rehearing Denied Oct. 19, 2007.

Katherine Carruth Link, of West Columbia, and Kenneth M. Mathews, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, and Solicitor Warren Blair Giese, all of Columbia, for Respondent.

Chief Justice TOAL:

This is a direct appeal in a criminal case. A jury convicted Appellant Grover Rye ("Appellant") of murder, and we certified the case for review from the court of appeals. Because we find that the jury was not properly charged regarding a defense Appellant asserted at trial, we reverse.

### FACTUAL/PROCEDURAL BACKGROUND

The events which culminated in the incident that is the subject of this appeal are both disturbing and bizarre. According to the record, Appellant owned a parcel of property on which he stored tools and equipment he used in his business. Although this property was not Appellant's primary residence, he occasionally slept in a house located on the property. Appellant visited the property every day, and sometimes more than once a day, to maintain the property and to feed several pet cats Appellant kept there.

Between March and August 2004, Appellant experienced continuous problems with trespassers on his property. According to the record, these trespassers not only entered Appellant's property, damaged the premises, and stole Appellant's equipment, the trespassers also made a sport of shooting (and killing) Appellant's pet cats. According to Appellant, he phoned the police on several separate occasions after discovering that trespassers had been on his property, but he was told that the police "did not need to respond to cat-killing reports."

According to the record, one of the primary trespassers was Appellant's neighbor. On the day of the incident which is the subject of the instant case, the neighbor, a friend, and the deceased (an off-duty county police deputy), took firearms onto Appellant's property and engaged in more of the violent activity we have described. After shooting for some time, the three trespassers returned to the neighbor's residence to reload. After accomplishing this, the neighbor and the deceased ventured back onto Appellant's property.

According to Appellant, he went onto his property at some point during this time period, saw a dead cat by the front steps of his house, and observed footprints around the house. Appellant alleges that he went to his cousin's house, phoned the police, and went back to his driveway to await the police's arrival. Appellant alleges that he then heard a gunshot on his property. At that point, Appellant grabbed his rifle from his vehicle and ran towards his house.

Appellant and the neighbor gave conflicting testimony at trial regarding the circumstances surrounding the shooting of the deceased. According to Appellant, he approached the house, heard additional gunshots around him, and then saw the deceased charging at him in a slouching position with his rifle. Appellant asserted that no words passed between the men, but that the men immediately exchanged gunfire. Appellant testified that after firing four shots at the deceased, Appellant ran from his property.

According to the neighbor, when he and the deceased returned from reloading their weapons, Appellant came around a corner on the property with his weapon raised. The neighbor testified that Appellant confronted the deceased, and that upon being confronted, the deceased held his gun by the handle to put the gun on the ground, requested that Appellant not shoot, and raised one of his arms. The neighbor testified that as the deceased kneeled to put down the gun, Appellant shot the deceased multiple times.

A jury convicted Appellant of murder, and this appeal followed. We certified the case for review from the court of appeals pursuant to Rule 204(b), SCACR, and Appellant purports to present a total of eight issues for our review. Exercising our prerogative to decide only those questions that are

necessary to the resolution of a case, we find that only one issue requires discussion:

Did the trial court err in refusing to charge Appellant's proposed charge on the defense of habitation?

## STANDARD OF REVIEW

A trial court's decision regarding jury charges will not be reversed where the charges, as a whole, properly charged the law to be applied. *State v. Burkhart,* 350 S.C. 252, 263, 565 S.E.2d 298, 304 (2002). Conversely, where a defendant requests a charge on a defense that is supported by the evidence presented at trial, the trial court is required to charge the jury on that defense, and the failure to do so is reversible error. *State v. Day,* 341 S.C. 410, 416–17, 535 S.E.2d 431, 434 (2000).

## LAW/ANALYSIS

Appellant argues that the trial court erred by incorrectly charging the jury as to the defense of habitation. We agree.

At trial, Appellant sought to make use of two defenses: self-defense and the defense of habitation. While charging the jury on the law of habitation, the trial court properly stated that the law recognizes the right of every person to defend his or her premises, but differentiated habitation from self-defense with the sole caveat that "[a] person defending his or her home or premises ... has no duty to retreat." Though this was most of the picture, it was not the complete picture.

In this case, it was important for the jury to fully understand exactly what "defending one's home or premises" meant. As the defense of habitation provides, defending one's home or premises means ending an unwarranted intrusion through the use of reasonably necessary means of ejection. *State v. Bradley,* 126 S.C. 528, 533, 120 S.E. 240, 242 (1923). By instructing that "[t]he same elements required by law to establish self-defense apply to the defense of habitation, with the exception of the duty to retreat," the charges in the instant case incorrectly implied that habitation requires a

defendant to establish that his person or property was in some danger of injury or harm.[1]

For the defense of habitation to apply, a defendant need only establish that a trespass has occurred and that his chosen means of ejectment were reasonable under the circumstances. *Bradley*, 126 S.C. at 533, 120 S.E. at 242. Stated differently, unlike the defense of self-defense, the defense of habitation does not require that a defendant reasonably believe that he (or his property) was in imminent danger sustaining serious injury or damage. Instead, the defense of habitation provides that where one attempts to force himself into another's dwelling, the law permits an owner to use reasonable force to expel the trespasser. Although our precedents properly recognize that self-defense and habitation are analogous, *see, e.g., State v. Sullivan*, 345 S.C. 169, 173, 547 S.E.2d 183, 185 (2001), the defenses are not identical.

In *Bradley*, this Court outlined four scenarios involving the law of habitation: (1) When the occupant is the slayer and stands upon habitation apart from self-defense; (2) When the occupant is the slayer, stands upon the right of self-defense, but claims immunity from his duty to retreat; (3) When the occupant is the slain and the homicide occurred while he sought to protect his habitation; and (4) When the occupant is the slain and the homicide occurred while he was attempting to eject a trespasser but was outside of his habitation. *Id.* at 233–37, 120 S.E. at 242–243. Although scenarios (3) and (4) clearly have no application here, a review of the record reveals that Appellant sought to avail himself not only of self-defense as described in scenario (2), but also of the defense of habitation described in scenario (1). By differentiating habitation from self-defense solely on the element of a duty to retreat,

---

1. This implication arises from one of the elements of the defense of self-defense. As our precedent recognizes, self-defense requires that a defendant show that (1) he was without fault in bringing on the difficulty; (2) he was in actual imminent danger of losing his life or sustaining serious bodily injury, or he must have actually believed he was in imminent danger of losing his life or sustaining serious bodily injury; (3) a reasonably prudent person of ordinary firmness and courage would have entertained the same belief; and (4) he had no other probable means of avoiding the danger. *State v. Bryant*, 336 S.C. 340, 344–45, 520 S.E.2d 319, 321–22 (1999).

the trial court's charge addressed the second scenario, but it did not address the first.

In the instant case, the trial court's charge on the defense of habitation was incomplete. For that reason, we must reverse.

## Conclusion

For the foregoing reasons, we reverse Appellant's conviction and remand the case for a new trial.

PLEICONES, J., and Acting Justice ALEXANDER S. MACAULAY, concur.

MOORE, J. dissenting in a separate opinion in which Acting Justice E.C. BURNETT, III, concurs.

Justice MOORE:

I respectfully dissent and would affirm the decision of the trial court.

## FACTS

The shooting death of Rob Odom (Odom) occurred on August 14, 2004. For several months prior to Odom's death, appellant had contended with vandalism, break-ins, thefts, destruction of property, and the killing of his pet cats at his property on 1300 VanBoklen Road. Appellant did not reside at the property but occasionally slept at the house located there. He also used the property to store tools and equipment needed in his heating and air conditioning business. He visited the property every day, sometimes more than once a day, to maintain the property and feed the cats.

Between March and August 14, 2004, appellant encountered many problems with trespassers on his property. The trespassers shot and killed appellant's cats on several occasions. On one occasion, the front door of the house had been kicked in and $975 worth of tools had been taken. The path the trespassers took led to 1324 VanBoklen. Sometimes appellant called the police and sometimes he did not. On one occasion, an officer responded and appellant testified she would not get out of her car. Appellant told her it was a continuous problem and that it was only going to escalate. He stated the officer

told him not to call 911 again and that deputies did not need to respond to cat-killing reports.

One of the perpetrators, Mason Mitchell, testified he thought the house was abandoned and that it was okay to shoot the cats. However, he admitted on cross-examination that he knew someone was feeding the cats. Mitchell was apparently an eyewitness to Odom's death and he and appellant gave conflicting stories as to what occurred that day.

According to Mitchell, on August 14, 2004, he, Odom, and James O'Connell went to appellant's property and shot cats, a box, an old car, and shot the lock off the barn. Odom had an AR–15, O'Connell had a .22 and Mitchell had a .40 caliber pistol. Mitchell alleged that this day was the first time Odom had ever joined him and O'Connell to shoot cats. After shooting for some time, they went back to their residence and reloaded. Then, Mitchell and Odom returned to the property to shoot more cats.

When they returned, they shot at one cat and then appellant came around the corner through the gate carrying a rifle. Appellant had his gun raised and told Odom to put his gun down. Odom allegedly said, "okay, don't shoot," and began to put his gun down. Odom also stated, "it's alright to be over here, it's alright to shoot the cats." Odom kneeled down to put the gun, which he was now holding by the handle, on the ground and his left arm was raised. As Odom was doing that, Mitchell testified appellant shot him. Odom hit the ground, screamed, and tried to crawl away. At this point, Mitchell was hiding behind another shed. He heard four shots total. He stated Odom never shot at appellant, nor did he.

Mitchell stated he ran back to his house and yelled for his friends to call 911. He and O'Connell went back to appellant's property to help Odom. Upon arriving, they encountered appellant who pointed his gun at them and told them they "better get off the property or the same thing would happen to" them. They left and then Mitchell and Odom's mother-in-law drove to appellant's property. Upon arriving, appellant told them Odom was dead and that they better get out of there or it would happen to them.

According to appellant, on August 14, 2004, he went to his property and saw a dead cat by the front steps of the house.

He also saw three sets of tracks and the lock shot off his barn. He went to his cousin's house and called 911. He then went back to wait in his driveway for the deputies. After hearing a pistol shot, he grabbed his rifle out of his truck and ran up to the house. He stated that his intention when he took the rifle out of his truck was to hold the guys there until the police came and that he had no intention of killing anyone. He went past one of the three gates and two shots rang out. He then saw Odom and a third shot went past him. Appellant went into his yard and Odom was charging at him in a slouching position with his rifle.

Appellant testified there was no doubt in his mind that Odom was going to shoot him. He stated no words were spoken between them. He stated he did not have a chance to aim his gun and that he just shot. He felt that if had waited a second, Odom would have killed him. He stated Odom fell in a position just like he was standing and that his hands were in the same position just like he was holding the gun.[2] Appellant testified Odom shot at him three times and he shot at Odom four times. Because he was afraid the other perpetrators were present, he ran to the gate expecting to be shot at.

Appellant then ran to his cousin James' home and again called 911. Appellant stated the following in this 911 call:

I just called you about somebody breaking into my damn barn, shooting my cats. Well, while I was on the phone with you, the son of a bitch come back in the yard and just pulled a gun on me and he's deader than goddamn hell now. I just shot the hell out of him. He pulled a gun on me.

He then went back to his property and encountered two men who he said were threatening to kill him. He stated he charged at them with his gun and they ran away.

Investigator Barnes testified that appellant's initial statements about where Odom and he were when the shots occurred were inconsistent with the evidence found at the scene. For instance, shell casings from Odom's gun were not found in the area that appellant indicated Odom was shooting him from. There was testimony, however, that Odom's gun had only 37 rounds in the magazine and one in the chamber,

---

2. Appellant did not explain how Odom's rifle ended up six feet from Odom's body or why the rifle was on safety when it was found.

meaning three shots could have been fired out of it.[3] After appellant was released from jail, he found some of Odom's shell casings located near a scrap metal pile, the location where appellant alleged Odom was initially. Barnes stated, however, that there is no way to determine when those casings were fired. Barnes testified that appellant has consistently stated that he shot at Odom in self-defense.

Deputy Janell McMillian testified she responded to a call at appellant's property. She testified appellant was upset because someone was trying to injure his cats and that he stated words to the effect that he was going to get whoever was injuring the cats or he was going to try and kill them.

Deputy Enzer testified that when he spoke with appellant, while on the burglary call, he became concerned because appellant informed him he had sat in the woods with his rifle the previous day. Deputy Enzer testified he told appellant that if he caught someone on his property, he should call the police and should not take action on his own. Deputy Enzer specifically told appellant not to shoot anyone over the cats.

Investigator Ray Livingston testified that when he spoke with appellant while on the burglary call, appellant stated that he did not want to hurt anyone and that he was going to try and sue whoever was killing the cats and damaging his property.

The autopsy revealed that the shot to Odom's neck was not fatal, but the other three shots were potentially fatal. The neck wound was from the side, one wound was slightly to the back, and the other two were from the back. Odom's left arm was elevated when he was shot. The wound angles were such that Odom could not have been facing appellant when he was shot.

During deliberations, the jury asked questions about whether malice could be determined by events in earlier days such as appellant's demeanor and his statements to officers. The court refused to comment on that question. The jury subsequently found appellant guilty of murder. After appellant's

---

3. A ballistics expert testified, however, that given it is difficult to fully load an AR–15, it would not be uncommon for only 38 rounds to be loaded into a 40–round magazine.

motion for a new trial was denied, the court sentenced him to thirty years' imprisonment.

## ISSUES

**I.** Did the trial court err by failing to direct a verdict of acquittal?

**II.** Did the trial court err by refusing to charge appellant's proposed charge on appearances and defense of habitation?

## DISCUSSION

### I. Directed Verdict

Appellant moved for a directed verdict, arguing it was impossible the killing occurred as declared by Mitchell and that there was no evidence to support the State's theory. The court denied the motion stating there was sufficient evidence to support the charge if the jury chooses to believe that evidence.

Appellant argues the directed verdict motion should have been granted because he acted in self-defense as a matter of law and because he acted in defense of his habitation as a matter of law.

A defendant is entitled to a directed verdict when the State fails to produce evidence of the offense charged. *State v. McHoney*, 344 S.C. 85, 544 S.E.2d 30 (2001). If there is any direct evidence or substantial circumstantial evidence reasonably tending to prove the guilt of the accused, the Court must find the case was properly submitted to the jury. *State v. Buckmon*, 347 S.C. 316, 555 S.E.2d 402 (2001). On appeal from the denial of a directed verdict, the Court must view the evidence in the light most favorable to the State. *State v. McHoney, supra.*

### *Directed Verdict Regarding Self–Defense*

To establish self-defense, the defendant must establish: (1) he was without fault in bringing on the difficulty; (2) he actually believed he was in imminent danger of losing his life or sustaining serious bodily injury; (3) a reasonably prudent person of ordinary firmness and courage would have enter-

tained the same belief; and (4) he had no other probable means of avoiding the danger. *State v. Long*, 325 S.C. 59, 480 S.E.2d 62 (1997). However, a person attacked on his own premises, without fault, has the right to claim immunity from the law of retreat. *Id.*

I would find there was sufficient evidence to send the case to the jury on the charge of murder. The State presented sufficient evidence showing that appellant may have not been acting in self-defense at the time he killed Odom. Specifically, the State presented evidence from an eye-witness that Odom never shot at appellant and that he was actually attempting to surrender his weapon at the time he was shot. Odom's weapon was found six feet from his body and Odom was actually shot in the back three times. The State also presented evidence that appellant had possibly laid in wait with his rifle to catch intruders on his property. Also, he had been cautioned by Deputy Enzer that he could not shoot someone because they had been shooting his cats. Accordingly, there was sufficient evidence showing that appellant may have been acting with malice aforethought and not in self-defense. Whether appellant was acting in self-defense was a question for the jury. Because there is evidence reasonably tending to prove appellant's guilt, the case was properly submitted to the jury by the trial court. *State v. Buckmon, supra.*

Appellant relies on the case of *State v. Hendrix*, 270 S.C. 653, 244 S.E.2d 503 (1978), for the proposition that he is entitled to an acquittal because self-defense was established as a matter of law. In *Hendrix*, the victim and Hendrix had a poor relationship. Early on the day of the shooting, the victim told Hendrix "they were going to have to fight to settle this thing." Later, the victim, while intoxicated, drove to Hendrix's property. While pointing a shotgun, Hendrix warned the victim to "back off." The victim returned to his truck, obtained a shotgun, and walked towards Hendrix. Hendrix told the victim to put his gun down and then shot four times in rapid succession and killed the victim. Witnesses for the State testified the victim never pointed his gun at Hendrix. Witnesses for the defense testified the victim pointed his gun at Hendrix and stated, "Say your prayers, I'm going to kill you."

In a 3–2 decision, the majority of the *Hendrix* court discussed the four elements of self-defense and found that self-defense was established as a matter of law. Regarding the fourth element, the majority stated that Hendrix was on his own land when the confrontation occurred and had no duty to retreat. Regarding the first element, the majority found nothing to indicate Hendrix had provoked the fatal altercation. Regarding the second and third elements, the *Hendrix* majority found these elements were clearly established by the evidence. The majority found that Hendrix was actually in immediate danger of losing his own life and the circumstances were such to warrant a man of ordinary prudence to strike the fatal blow to save his own life. The majority concluded that a verdict of acquittal was appropriate.

The *Hendrix* dissent found that, based on the testimony, there were at least two inferences that could be drawn to explain why Hendrix shot the victim: (1) that Hendrix acted under a reasonable apprehension of danger, either actual or apparent, in which case the killing was justified; or (2) that Hendrix acted out of malice, in which case the killing was unlawful. I would find that the dissent appropriately concluded that it was a factual question whether Hendrix shot and killed the victim in self-defense or out of malice and that this factual question was solely within the province of the jury, not the court. Accordingly, I would overrule the *Hendrix* decision to the extent the majority of that court determined that self-defense could be established as a matter of law although there is more than one inference to be drawn from the evidence presented.

In the instant case, given there are two inferences to be drawn from the evidence presented at appellant's trial, the trial court properly denied the motion for a directed verdict.

### Directed Verdict Regarding Defense of Habitation

The defense of habitation is analogous to self-defense and should be charged when the defendant presents evidence that he was defending himself from imminent attack on his own premises. *State v. Sullivan*, 345 S.C. 169, 547 S.E.2d 183 (2001). To establish the defense of habitation, the defendant must establish that a trespasser has endeavored to enter his habitation in a violent manner or with intent to commit a

felony on him or the habitation itself or in an attempt to commit the misdemeanor of forcible entry. *State v. Bradley,* 126 S.C. 528, 120 S.E. 240 (1923); *State v. Brooks,* 79 S.C. 144, 60 S.E. 518 (1908). The defendant is permitted to use deadly force against the trespasser and there is no duty for the defendant to retreat before taking the life of the trespasser. *Brooks, supra.*

The trial court did not err by denying the directed verdict motion because whether appellant was acting in the defense of his habitation is a factual question to be resolved by the jury. As previously noted, there was sufficient evidence showing that appellant may have been acting with malice aforethought when he shot Odom. Whether appellant was actually acting in defense of habitation was a jury question.

## II. Proposed Charges

The trial court charged the jury:

The defendant has raised in this case what is called the defense of self-defense. Self-defense is a complete defense. And if it is established, you must find the defendant not guilty. The State had the burden of disproving self-defense by proof beyond a reasonable doubt as I have already defined that term for you. If you have a reasonable doubt of the defendant's guilt after considering all of the evidence, including the evidence of self-defense, then you must find the defendant not guilty. On the other hand, if you have no reasonable doubt of the defendant's guilt after considering all the evidence, including the evidence of self-defense, then you must find the defendant guilty.

The following elements are required to establish self-defense. . . .

First, the defendant must be without fault in bringing on the difficulty. If the defendant's conduct was the type which was reasonably calculated to and did provoke a deadly assault, the defendant would be at fault in bringing on the difficulty and would not be entitled to an acquittal based on self-defense.

The second element of self-defense is that the defendant was actually in imminent danger of death or serious bodily injury or that the defendant actually believed that he was in imminent danger of death or serious bodily injury. If the

defendant was actually in imminent danger, it must be shown that the circumstances would have warranted a person of ordinary firmness and courage to strike the fatal blow to prevent death or serious bodily injury. If the defendant believed that he was in imminent danger of death or serious bodily injury, it must be shown that a reasonably prudent person of ordinary firmness and courage would have had the same belief.

In deciding whether the defendant actually was or believed that he was in imminent danger of death or serious bodily injury, you should consider all the facts and circumstances surrounding the crime, including the physical condition and characteristics of the defendant and the victim.

The defendant does not have to show that he was actually in danger. It is enough that the defendant believed he was in imminent danger and a reasonable and prudent person of ordinary reason and ordinary firmness and courage would have had the same belief.

The defendant has the right to act on appearances, even though the defendant's beliefs may have been mistaken. It is for you to decide whether the defendant's fear of immediate danger of death or serious bodily injury was reasonable and would have been felt by an ordinary person in the same circumstances or situation.

I will further charge you that evidence of prior difficulty between the defendant and the victim may be considered in deciding whether the threat existed, whether the defendant had a reason to believe that a threat existed and how serious the threat was.

I will further charge you that relative sizes, ages and weights of the defendant and the victim may be considered in deciding the apparent or the actual need for force in self-defense and the amount of force that was needed.

The final element of self-defense is that the defendant had no probable way to avoid the danger of death or serious bodily injury than to act as the defendant did in this particular circumstance. I will charge you that if the defendant was on his own premises, on his own property, the defendant had no duty to retreat before acting in self-defense. A defendant has no duty to retreat if by doing so the danger of being killed or suffering serious bodily injury would increase. And I would further charge you that a

person cannot be required to make an exact calculation as to the degree or the amount of force which may be needed to avoid death or serious bodily harm; therefore, in self-defense the defendant has the right to use the force needed to avoid death or serious bodily harm.

The force used in self-defense does not have to be limited to the degree or the amount of force used by the victim. The defendant has the right to use so much force as appeared to be necessary for complete self-protection and which a person of ordinary reason and firmness would have believed they needed to prevent death or serious bodily harm. If the defendant is justified in defending himself or others and in firing the first shot, then the defendant is also justified in continuing to shoot until it is apparent that the danger of death or serious bodily injury has completely ended.

A. *Proposed Charge on Defense of Habitation*

The trial court charged the defense of habitation by stating:

∴ the law recognizes the right of every person to defend his or her premises. The same elements required by law to establish self-defense apply to the defense of habitation, with the exception of the duty to retreat. A person defending his or her home or premises or property on their own premises has no duty to retreat, and the same burden of proof as applies to self-defense applies to this defense of habitation, that is, the burden of proof is on the State to prove that the defense of habitation did not exist, and the State must prove that beyond a reasonable doubt.

Appellant argues, however, that his proposed charge should have been given because the requested charge was not otherwise covered by the court's charge. Appellant's proposed charge on the defense of habitation stated:

A person may use deadly force to protect his home. Thus, he may use deadly force to eject a trespasser who is in his house or in the area immediately surrounding his house.

Unless the trespasser is peaceable and well-behaved, defendant is not required to ask the trespasser to leave before using force.

The trial court refused to charge the proposed charge because the court believed it had adequately covered the law.

It was unnecessary for the trial court to use the proposed charge when his charge to the jury adequately covered the contents of the proposed charge. The habitation charge the court gave stated that a person has a right to defend their premises and does not have a duty to retreat. Further, the court charged that the same elements required to establish self-defense apply to the defense of habitation. Included within the self-defense charge were the following statements: (1) "a person cannot be required to make an exact calculation as to the degree or the amount of force which may be needed to avoid death or serious bodily harm; therefore, ... the defendant has the right to use the force needed to avoid death or serious bodily harm;" (2) "The force used ... does not have to be limited to the degree or the amount of force used by the victim. The defendant has the right to use so much force as appeared to be necessary for complete self-protection and which a person of ordinary reason and firmness would have believed they needed to prevent death or serious bodily harm;" and (3) "the defendant is also justified in continuing to shoot until it is apparent that the danger of death or serious bodily injury has completely ended." Accordingly, the statements regarding deadly force were sufficiently covered in the court's charge. *See State v. Austin,* 299 S.C. 456, 385 S.E.2d 830 (1989) (if trial court refuses to give specific charge, there is no error if charge actually given sufficiently covers substance of request).

While nothing in the court's charge mentioned the word "trespasser" or that the defendant "is not required to ask the trespasser to leave before using force," all that is required is that the substance of the law must be charged to the jury, not any particular verbiage. *State v. Hughey,* 339 S.C. 439, 529 S.E.2d 721, *cert. denied,* 531 U.S. 946, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000). While the requested charge would not have been inappropriate, the trial court's charge, when considered as a whole, adequately covered the applicable law under the facts of this case. Therefore, I would find the trial court did not err by failing to charge appellant's proposed instruction on the defense of habitation.

### B. *Proposed Charge on Acting on Appearances*

Appellant's proposed charge on appearances is as follows:

In the consideration of whether self-defense is applicable herein, you should try as near as you can to put yourself in defendant's situation at the time he [fired the fatal shot]. You should consider the circumstances by which he was surrounded, and take into consideration the person with whom he was dealing, and all of the facts which surrounded him, as you obtained the same from the testimony, and as near as you can, view the situation from defendant's standpoint. Unless the state shows that a person of ordinary reason, coolness and prudence would not have acted as defendant did under the circumstances that surrounded him at the time the fatal [shot was fired] then you should find the defendant not guilty.

The trial court refused to charge the proposed charge because the court believed it had adequately covered the law.

A request to charge a correct statement of the law on an issue raised by the indictment and the evidence presented at trial should not be refused. *State v. Austin,* 299 S.C. 456, 385 S.E.2d 830 (1989). However, if the trial court refuses to give a specific charge, there is no error if the charge actually given sufficiently covers the substance of the request. *Id.*

Although appellant's proposed charge on appearances was a correct statement of the law,[4] it was unnecessary for the trial court to use the proposed charge when his charge to the jury adequately covered the contents of the proposed charge. Besides the specific appearances charge the court issued, the court also charged the jury the following:

If the defendant was actually in imminent danger, it must be shown that the circumstances would have warranted a person of ordinary firmness and courage to strike the fatal blow to prevent death or serious bodily injury. If the defendant believed that he was in imminent danger of death or serious bodily injury, it must be shown that a reasonably prudent person of ordinary firmness and courage would have had the same belief.

In deciding whether the defendant actually was or believed that he was in imminent danger of death or serious

---

4. *See State v. Rash,* 182 S.C. 42, 188 S.E. 435 (1936) (finding this charge embodied a sound proposition of law and should have been charged in connection with the element of self-defense).

bodily injury, you should consider all the facts and circumstances surrounding the crime, including the physical condition and characteristics of the defendant and the victim.

The defendant does not have to show that he was actually in danger. It is enough that the defendant believed he was in imminent danger and a reasonable and prudent person of ordinary reason and ordinary firmness and courage would have had the same belief.

Accordingly, I would find the trial court did not err by refusing to give appellant's proposed charge on appearances. *See State v. Burkhart*, 350 S.C. 252, 565 S.E.2d 298 (2002) (failure to give requested jury instruction is not prejudicial error where the instructions given afford the proper test for determining the issues); *State v. Hughey*, 339 S.C. 439, 529 S.E.2d 721, *cert. denied*, 531 U.S. 946, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000) (trial court's refusal to provide specific jury instructions is not reversible error if the general instructions are sufficiently broad to enable the jury to understand the law and the issues involved).

## CONCLUSION

Whether appellant was actually acting in self-defense or in defense of his habitation were questions for the jury. Therefore, I would find the trial court properly denied the motions for directed verdict and that the trial court did not err by refusing to charge appellant's proposed instructions to the jury. Further, I would affirm appellant's remaining issues pursuant to Rule 220(b)(1), SCACR, and the following authorities: *Issue 4: State v. Gaster*, 349 S.C. 545, 564 S.E.2d 87 (2002) (the admission or exclusion of evidence is a matter addressed to the sound discretion of the trial court and its ruling will not be disturbed in the absence of a manifest abuse of discretion accompanied by probable prejudice); *Clark v. Cantrell*, 339 S.C. 369, 529 S.E.2d 528 (2000) (trial judge has broad discretion in determining whether to admit demonstrative evidence including charts and diagrams which are not direct evidence and have only secondary relevance); *State v. McAlister*, 149 S.C. 367, 147 S.E. 310 (1929) (admission of an inaccurate crime scene diagram not in error where judge informed jury it was not drawn to scale and informed jury it was admissible for the purpose of explaining a witness' testi-

mony regarding landmarks); *Issue 5: State v. Tucker,* 319 S.C. 425, 462 S.E.2d 263 (1995), *cert. denied,* 516 U.S. 1080, 116 S.Ct. 789, 133 L.Ed.2d 739 (1996) (admission of evidence is within trial court's discretion and absent abuse of discretion, it will not be reversed on appeal); *Issue 6: State v. Shuler,* 344 S.C. 604, 545 S.E.2d 805, *cert. denied,* 534 U.S. 977, 122 S.Ct. 404, 151 L.Ed.2d 306 (2001) (improper vouching occurs when the prosecution places the government's prestige behind a witness by making explicit personal assurances of a witness' veracity, or where a prosecutor implicitly vouches for a witness' veracity by indicating information not presented to the jury supports the testimony); *Issue 7: State v. Bryant,* 372 S.C. 305, 642 S.E.2d 582 (2007) (defendants making a claim under *Brady* must demonstrate that (1) the evidence was favorable to the defense; (2) it was in the possession of or known to the prosecution; (3) it was suppressed by the prosecution; and (4) it was material to guilt or punishment); *Issue 8: State v. Johnson,* 334 S.C. 78, 512 S.E.2d 795 (1999) (to qualify for reversal on ground of cumulative effect of trial errors, defendant must demonstrate errors adversely affected his right to fair trial).

I further find no merit to the State's Issue requesting the dismissal of the appeal for failure to timely serve the Notice of Appeal. Pursuant to Rule 233(b), SCACR, the service was properly made by mailing to the solicitor at his last known address.

Acting Justice E.C. BURNETT, III, concurs.