705 S.E.2d 465

The STATE, Respondent,

v.

Thomas T. BRYANT, Jr., Appellant.

No. 4766.

Court of Appeals of South Carolina.

Heard Nov. 3, 2010.

Decided Dec. 15, 2010.

Rehearing Denied Feb. 28, 2011.

Chief Appellate Defender Robert M. Dudek, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Assistant Attorney General Alphonso Simon, Jr., Solicitor Warren B. Giese, all of Columbia, for Respondent.

HUFF, J.

Thomas T. Bryant, Jr. was convicted of murder in the death of Daniel Austin. Bryant appeals, asserting the trial judge erred in (1) refusing to admit into evidence a dispatch log of a 911 call and (2) refusing to instruct the jury on the defense of habitation. We reverse and remand for a new trial.[1]

## FACTUAL/PROCEDURAL BACKGROUND

The record shows Bryant is a paraplegic who is confined to a wheelchair. At the time of this incident, Bryant had been living at a Days Inn Hotel, located approximately 150 yards from the "Bottoms Up" nightclub. On the night of July 22, 1999, Bryant met Austin at the nearby nightclub. Austin, who was at the club with some other men from North Carolina, became friendly with Bryant. As the night wore on, both Bryant and Austin became intoxicated.

There is conflicting evidence on the relationship of the two men that evening and what occurred between them. An employee of the club characterized the two as being "very chummy," and observed no arguments, fighting, or violence

---

1. Bryant was initially tried and convicted of Austin's murder in 2001. That conviction was reversed by the supreme court in 2006 based on the improper admission of Bryant's prior firearms convictions, and Bryant was re-tried in 2008. *State v. Bryant,* 369 S.C. 511, 633 S.E.2d 152 (2006). It is from his second conviction for murder that Bryant appeals.

between Bryant and Austin. According to Bryant, Austin and the two other men with Austin pressed Bryant to obtain some marijuana. Bryant told them "he did not do that" and informed them he did not know where to obtain any. At approximately 3:30 a.m. on July 23, 1999, Bryant and Austin left the nightclub. The nightclub employee testified that just before they left, Bryant had fallen from his wheelchair and the employee and Austin assisted Bryant back into the chair and helped him out the door. Austin then continued to help Bryant down the road toward the Days Inn, "pushing him along, still talking, still carrying on, having a good time." Bryant, however, testified he was attempting to leave the club by himself when Austin followed him in the parking lot and was on the back of his wheelchair, telling Bryant to let him help him.

Nellie Connell, the night auditor and desk clerk at the Days Inn, was working the night shift when in the early morning hours she observed a gentleman pushing Bryant in his wheelchair. According to Connell, the two men were laughing and talked "like two buddies." As she watched them, she saw Bryant fall out of his wheelchair when they hit a speed bump in the parking lot. The other gentleman then put Bryant back into his wheelchair.

Bryant testified he repeatedly told Austin he did not need his help. When Austin continued, Bryant stopped his chair and told Austin he did not want his help and Austin should leave him alone and let him go. Austin then pushed Bryant, causing him to almost fall from his chair. Austin and Bryant began swinging at each other and Bryant was knocked from his chair. Austin then picked Bryant up and placed him back in his wheelchair. As Bryant attempted to roll away, Austin grabbed the back of his chair and they argued again. As they rolled down the street, Bryant stopped again and told Austin to leave him alone, but Austin began cussing at Bryant, harassing him again for some drugs. Bryant stated another altercation ensued in which Bryant was again knocked from his chair, but this time Austin kicked Bryant in the face twice. Because he could not get away from Austin, Bryant finally "went along with it," and the two ended up outside Bryant's room at the Days Inn.

Bryant claimed he was scared to open the door to the room with Austin standing there because Austin had been pressing him for marijuana and they had been fighting. He attempted to stall in opening his door and Austin tried to snatch a pouch from him, which contained his room key, causing the contents of the pouch to fall to the ground. The two men cussed at each other, and Austin left, presumably to go to the front desk to obtain a room key. During this time, a gentleman named Mr. Hawkins walked through, and Bryant asked Hawkins to help him by "get[ting] somebody to call" because "they done beat me up and I feel like they're going to rob me." Bryant testified he referred to "they" because he was concerned one or two of the other men with Austin that night might be "hanging back waiting." Hawkins agreed to go to the desk and get the night clerk to call the police. Thereafter, Bryant found his key and opened the door to his room. Once he entered, but before he could shut his door, Austin came in the room behind him and shut the door. Bryant testified he did not invite Austin into his room and did not want him in there. Bryant maintained he was scared, as Austin then stated, "I'm going to kill you," and Austin had shut the door to the room. Bryant then opened a drawer to a nightstand and pulled out a pistol. When he turned around, Austin, who was "a good six feet in the door" was coming toward him, and he shot Austin "once[,] ... twice, maybe a few more times." According to Bryant, Austin fell, got right back up, opened the door and ran from the room. Bryant dropped his pistol on his bed, retrieved a shotgun from his dresser, rolled out of the door and saw Austin standing in the breezeway. Bryant then started shooting Austin until his shotgun was empty.

Bryant further testified, at the time he saw Austin in the breezeway, "I had done had—I'm seeing red. I'm very angry, mad. I've been done like this—I was done like this for no reason. And when I seen him, I started shooting him, and I just—I just shot. I shot my shotgun 'til it was—I believe it was empty." Bryant explained he did not know if Austin had a weapon or not, but he was concerned Austin could get his weapon, and stated, "I was scared to death." Bryant stated, after having been treated the way he was, he was not thinking and recognized, "I was just seeing red because I'd done had enough. I'd done been beat, kicked and everything over

something that I didn't even do." He claimed he did not plan on killing Austin, but he did so because he was scared for his life and did not feel he had any other options at that time, as he felt Austin was going to hurt him badly or kill him. Bryant further acknowledged that he was angry and he grabbed his shotgun, and when Austin fell and then jumped up and ran, he did not know if he had hit Austin, but he was scared because he believed another person was out there besides Austin.

When the authorities arrived, Austin was lying in the breezeway bleeding from gunshot wounds, and shots were being fired from Bryant's room. After a standoff lasting approximately twenty minutes, officers heard one final, muffled pistol shot. The officers entered Bryant's room and found Bryant on the floor with a self-inflicted gunshot wound to his stomach. Bryant was transported to the hospital for treatment, but Austin died at the scene.

An autopsy showed Austin suffered from birdshot and buckshot wounds, as well as three standard bullet gunshot wounds. Two of the standard bullets, consistent with a .32 caliber projectile, were recovered from the upper portion of the right side and just above the hip on the right side of Austin's body. The pathologist testified the most deadly or dangerous shot, and the cause of Austin's death, was the gunshot delivered to the upper portion of Austin's right side, which fractured a rib, passed through the right lung, ruptured the aorta, and passed through the left lung. He opined that after receiving this gunshot, about half of Austin's blood volume would have been immediately pouring out into his chest, his blood pressure would have dropped, he would start to lose consciousness, and within seconds he would have been on the ground. While a wound to Austin's left side, where shotgun pellets entered his left lung, would have been a dangerous wound, it was not fatal in an immediate manner as was the standard bullet wound to the right upper side of Austin's body. Had this fatal gunshot wound from the .32 caliber projectile occurred first, Austin would have been able to walk a short period of time, and it was not outside the realm of possibility that he could have run twenty feet.

Following presentation of all the evidence, the trial judge discussed the matters he intended to charge. Bryant noted he

requested a charge on the defense of habitation.[2] The trial judge recognized Bryant had requested the charge but declined to include it in his instructions to the jury, noting he was charging, as part of the self-defense instruction, that a defendant had no duty to retreat while on his own premises before acting in self-defense and, in addition was charging "words accompanied by hostile acts, prior difficulties, age, prior violence by the victim, threats by the victim, no other way to avoid the danger, and then no duty to retreat if on your own premises, [and] degree of force continuing until the threat of harm is ended," finding defense of habitation was going to be covered by his charge. The trial judge thereafter charged the jury as he indicated and did not include the defense of habitation charge sought by Bryant.[3] Bryant was convicted of murdering Austin and was sentenced to life imprisonment without parole. This appeal followed.

## ISSUES

I. Did the trial judge err by refusing to instruct the jury on the defense of habitation because a self-defense instruction was not sufficient to cover this separate distinct defense when Bryant testified he was threatened in and around his hotel

---

2. Trial counsel, citing *State v. Rye*, 375 S.C. 119, 651 S.E.2d 321 (2007), and *State v. Bradley*, 126 S.C. 528, 120 S.E. 240 (1923), requested the following defense of habitation charge: "A person may use deadly force to protect his home. Thus, he may use deadly force to eject a trespasser who is in his house or in the area immediately surrounding his house. For the defense of habitation to apply, a defendant need only establish that a trespass has occurred and that his chosen means of ejectment were reasonable under the circumstances. Stated differently, unlike the defense of self-defense, the defense of habitation does not require that a defendant reasonably believe that he (or his property) was in imminent danger [of] sustaining serious injury or damage. Instead, the defense of habitation provides that where one attempts to force himself into another's dwelling, the law permits an owner to use reasonable force to expel the trespasser."

3. While trial counsel did not thereafter except to the charge as given, the matter is still preserved for our review. *See State v. Johnson*, 333 S.C. 62, 64 n. 1, 508 S.E.2d 29, 30 n. 1 (1998) (wherein our supreme court set forth the following preservation rule: "[W]here a party requests a jury charge and, after opportunity for discussion, the trial judge declines the charge, it is unnecessary, to preserve the point on appeal, to renew the request at conclusion of the court's instructions.").

232

room and Bryant was entitled to this instruction under the facts of this case?

**II.** Did the trial judge err by refusing to admit evidence of a Richland County Sheriff's Department computer-aided dispatch record that showed the Days Inn night clerk told the dispatch operator that a man was being "pushed around and pushed out of wheelchair" because this document was admissible as a business record, and the trial judge erred by excluding this critical evidence of self-defense?

## LAW/ANALYSIS

I. Defense of Habitation Charge

On appeal, Bryant asserts the defense of habitation provides that defending one's home or premises means ending an unwarranted intrusion through the use of reasonably necessary means of ejection, that an instruction that the same elements required by law to establish self-defense apply to the defense of habitation with the exception of duty to retreat is an improper charge as it incorrectly implies the defense of habitation requires a defendant to establish his person or property was in danger of injury or harm, for the defense of habitation to apply a defendant need only establish a trespass has occurred and the chosen means of ejectment were reasonable, and the defense of habitation is analogous to self-defense and should be charged when the defendant presents evidence that he was defending himself from imminent attack on his own premises. Bryant argues evidence that Austin entered his hotel room without consent after Austin had beaten him, that Bryant asked another person to summon help, and that Austin was not a guest in his room and had threatened to kill him is evidence Bryant was acting in self-defense, as well as evidence he was attempting to eject a trespasser, therefore entitling him to a charge on the defense of habitation.

The State acknowledges the law provides as to the defense of habitation that defending one's home or premises means ending an unwarranted intrusion through the use of reasonably necessary means of ejection, and one is permitted to use deadly force against a trespasser, with no duty to retreat before taking the life of the trespasser. However, the State asserts Bryant was not entitled to a defense of habitation

charge because there was no evidence indicating that he was attempting to eject a trespasser. Specifically, the State contends there was no evidence indicating Bryant was attempting to eject Austin when he shot him in the hotel room. Rather, it maintains Bryant's testimony clearly indicates that ejecting Austin was not his concern during his assault on Austin, citing Bryant's testimony that he followed Austin out to the breezeway and that he saw red, he was very angry and mad because he had been "done like this for no reason," when he saw Austin he started shooting him, and he shot until his shotgun was empty. The State further contends, even if the trial judge erred in declining to give the requested defense of habitation charge, the error was harmless as Bryant's guilt was conclusively proven by competent evidence at trial and no other rational conclusion could have been reached.

The law to be charged to the jury is determined by the evidence presented at trial. *State v. Gaines,* 380 S.C. 23, 31, 667 S.E.2d 728, 732 (2008). If there is any evidence to support a jury charge, the trial judge should give a requested charge on the matter. *State v. Burriss,* 334 S.C. 256, 262, 513 S.E.2d 104, 108 (1999). To warrant reversal, a trial judge's refusal to give a requested jury charge must be both erroneous and prejudicial to the defendant. *Gaines,* 380 S.C. at 31, 667 S.E.2d at 732. The refusal to grant a requested jury charge that states a sound principle of law applicable to the case at hand constitutes an error of law. *State v. Pittman,* 373 S.C. 527, 570, 647 S.E.2d 144, 167 (2007).

The defense of habitation provides that defending one's home or premises means ending an unwarranted intrusion through the use of reasonably necessary means of ejection. *State v. Rye,* 375 S.C. 119, 123, 651 S.E.2d 321, 323 (2007). "One defending himself from imminent attack on his own premises is entitled to a charge of defense of habitation." *State v. Lee,* 293 S.C. 536, 537, 362 S.E.2d 24, 25 (1987). "For the defense of habitation to apply, a defendant need only establish that a trespass has occurred and that his chosen means of ejectment were reasonable under the circumstances." *Rye,* 375 S.C. at 124, 651 S.E.2d at 323. Unlike the defense of self-defense, the defense of habitation does not require that a defendant reasonably believe that he or his

property was in imminent danger of sustaining serious injury or damage. *Id.* Rather, the defense of habitation provides "where one attempts to force himself into another's dwelling, the law permits an owner to use reasonable force to expel the trespasser." *Id.* "The defense of habitation is analogous to self-defense and should be charged when the defendant presents evidence that he was 'defending himself from imminent attack on his own premises.'" *State v. Sullivan,* 345 S.C. 169, 173, 547 S.E.2d 183, 185 (2001) (quoting *Lee,* 293 S.C. at 537, 362 S.E.2d at 25). Although self-defense and habitation are analogous, the defenses are not identical. *Rye,* 375 S.C. at 124, 651 S.E.2d at 323.

When one becomes a trespasser, the law permits the owner of the home to employ such force, even to the taking of the life of the trespasser, as may be reasonably necessary to accomplish the expulsion. *State v. Sparks,* 179 S.C. 135, 137, 183 S.E. 719, 720 (1936).

> A man who attempts to force himself into another's dwelling, or who, being in the dwelling by invitation or license refuses to leave when the owner makes that demand, is a trespasser, and the law permits the owner to use as much force, even to the taking of his life, as may be reasonably necessary to prevent the obtrusion or to accomplish the expulsion.

*State v. Bradley,* 126 S.C. 528, 533, 120 S.E. 240, 242 (1923).

In the case at hand, although there is conflicting evidence as to the relationship between Austin and Bryant on the night in question, Bryant presented evidence that he was in a vulnerable position, being confined to a wheelchair, that he argued with and was assaulted by Austin and attempted to get away from Austin prior to entering his room at the hotel, that he attempted to prevent Austin from entering his room with delay tactics, that Austin was not invited in the room but managed to enter it after Bryant entered but before Bryant was able to close the door, that Austin advanced toward Bryant and threatened to kill Bryant, and that Bryant then shot Austin with his pistol while in the hotel room. Thus, there is evidence from which the jury could conclude Austin became a trespasser by forcing himself into Bryant's dwelling and that Bryant was defending himself from imminent attack

on his own premises. Further, the law permits the owner of the home to employ such force, even to the taking of the life of the trespasser, as may be reasonably necessary to accomplish the expulsion. Accordingly, contrary to the State's assertion, there is evidence Bryant was attempting to eject a trespasser from his dwelling such that he was entitled to a defense of habitation charge.

In arguing there was no evidence Bryant was attempting to eject a trespasser from his premises, the State points to Bryant's testimony that he was mad and angry when he followed Austin out of his room and into the breezeway where Bryant then shot at Austin until his shotgun was empty. We recognize the law provides that the right of the occupant to expel a trespasser and to use such force as might be necessary, even to killing him, is limited to the place of his habitation and perhaps his curtilage, and the defense of habitation does not exist at the place of a homicide that is away from the habitation and away from the curtilage. *Bradley,* 126 S.C. at 537, 120 S.E. at 243. *See also State v. Boyd,* 126 S.C. 300, 302, 119 S.E. 839, 840 (1923) (holding that one on his land, adjoining a public road, if assaulted by another who is on such road, is bound to retreat before taking the life of his adversary, if there is probability of his being able to escape without losing his life or suffering grievous bodily harm, the reason of this distinction being that, under the circumstances, he would not have the right to eject his adversary from the place where the adversary had a right to be); *State v. Rochester,* 72 S.C. 194, 203, 51 S.E. 685, 688 (1905) (holding, if the defendant was attacked while on his own premises by the deceased, who was at that time on the public highway, or where he had a right to be, then the defendant was bound to retreat before taking the life of his adversary, if there was a probability of his being able to escape without losing his life or suffering grievous bodily harm, the reason being that under such circumstances he would not have had the right to eject his adversary from the place where he had a right to be). Had the evidence shown Bryant peaceably ejected Austin from his room and then followed Austin out to the breezeway, a place Austin was entitled to be and no longer a trespasser in Bryant's dwelling, it is unlikely that Bryant would have been entitled to a defense of habitation charge had he thereafter

inflicted a fatal blow. We need not decide that point, however, as there is evidence that when Bryant fired the fatal shot, he was attempting to eject Austin as a trespasser from his dwelling. Bryant testified that he shot Austin with his pistol while Austin was present in his room, and then followed Austin out into the breezeway, leaving his pistol behind and shooting him there with his shotgun. The testimony of the pathologist who performed the autopsy on Austin indicates that the injury that caused Austin's death was inflicted by the pistol and not the shotgun. Accordingly, the fatal shot, based on this testimony, occurred while Austin was in Bryant's room and Bryant was attempting to eject him as a trespasser. Though Bryant's testimony that he thereafter followed Austin outside his room and continued to shoot Austin, at least in part out of anger, may be evidence that Bryant's goal was not, in fact, to eject Austin as a trespasser, we find such determination is for the jury, as there was evidence adduced at trial from which the jury could find Bryant was attempting to eject a trespassing Austin from his dwelling when Bryant inflicted the fatal blow.

■ Further, although self-defense and defense of habitation are analogous, it is insufficient to charge only self-defense when a charge on defense of habitation is warranted. In *Rye*, the trial judge actually charged the jury in part on the defense of habitation, instructing that the law recognized the right of every person to defend his or her premises, "but differentiated habitation from self-defense with the sole caveat that '[a] person defending his or her home or premises ... has no duty to retreat.'" *Rye*, 375 S.C. at 123, 651 S.E.2d at 323. The court found, by instructing the jury that " '[t]he same elements required by law to establish self-defense apply to the defense of habitation, with the exception of the duty to retreat,' the charges [in that case] incorrectly implied that [defense of] habitation requires a defendant to establish that his person or property was in some danger of injury or harm." *Id.* at 123–24, 651 S.E.2d at 323. Thus, the court in *Rye* determined the jury was not properly charged on the defense of habitation. Likewise, the trial judge's charge on self-defense in the case at hand was clearly insufficient to cover the law on the defense of habitation.

Finally, we believe there is no merit to the State's assertion that any error in the failure to charge the jury on the defense of habitation is harmless because of overwhelming evidence of Bryant's guilt. In making this argument, the State points to evidence that is either incorrect, in dispute, and/or irrelevant to the defense of habitation. Essentially, the arguments raised by the State in this regard are matters for the jury. At any rate, inasmuch as the trial judge effectively deprived Bryant of an entire defense, the error here cannot be harmless.

## II. Exclusion of 911 Log

Because we reverse Bryant's conviction and remand for a new trial based on the failure of the trial judge to charge defense of habitation, it is unnecessary to address the second issue. *See Rye*, 375 S.C. at 122–23, 651 S.E.2d at 323 (noting, although appellant presented a total of eight issues for appellate review, the court, exercising its prerogative to address only those issues necessary to resolution of a case, addressed only the refusal of the trial court to charge Rye's proposed charge on the defense of habitation). *See also State v. Mekler*, 379 S.C. 12, 17, 664 S.E.2d 477, 479 (2008) (affirming this court's decision reversing defendant's conviction and granting a new trial based on failure to charge involuntary manslaughter, but finding it unnecessary to address an issue concerning the admission of evidence decided by this court, noting whether this issue will arise on retrial and its resolution will depend upon the evidence and testimony presented, and it will be for the trial judge's consideration).

## CONCLUSION

For the foregoing reasons, we hold Bryant was entitled to a defense of habitation charge as evidence was presented to show Bryant was attempting to eject a trespasser from his premises when he inflicted the fatal blow. Accordingly, we reverse Bryant's conviction and remand for a new trial.

**REVERSED AND REMANDED.**

KONDUROS and LOCKEMY, JJ., concur.